**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 91-2287**
_____

**MICHAEL LLOYD SELF,**

**Petitioner-Appellee,**

**versus**

**JAMES A. COLLINS, Director,
Texas Department of Criminal
Justice, Institutional Division,**

**Respondent-Appellant.**

_____

**Appeal from the United States District Court for the
Southern District of Texas**

_____

**(September 22, 1992)**

Before SNEED,[1] REAVLEY, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

This appeal is bottomed on "our federalism" and turns on the proper application of the 28 U.S.C. § 2254(d) presumption of correctness accorded state findings of fact. Its genesis is Michael Lloyd Self's conviction in 1973 for murder. In 1991, the district court granted his habeas application, holding that his confession, the critical evidence at trial, was obtained in violation of his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel. Based on our review of the state record, we conclude that the district

---

[1] Senior Circuit Judge of the Ninth Circuit, sitting by designation.

court, *inter alia*, violated § 2254(d) by disregarding state findings which are fairly supported by the record, and so erred, in part, by making credibility choices contrary to those of the state judge who observed the witnesses' demeanor. We hold that the challenged confession was not obtained contrary to the Constitution and, therefore, **REVERSE** and **REMAND** for entry of an order of dismissal.

## I.

Self's problems with law enforcement began in 1970, when he was accused of "window peeping". In exchange for his agreeing to psychiatric treatment, no charges were filed. Self received such treatment on three occasions between October 1970 and January 1971.

About seven months later, on August 4, 1971, Sharon Shaw and her friend, Rhonda Renee Johnson, were last seen, when they left Webster, Texas, to make a day-trip to Galveston, about 25 miles away. (Located in Harris County, near Houston, Webster had a population of around 1,500.) Rhonda Johnson's grandfather was a member of the city council, which appointed the police chief. J. C. Norman was the chief then, and he and Self were friends. Webster policeman David Coburn took charge of the investigation into the girls' disappearance. In early 1972, their skeletal remains were discovered in a desolate area near Webster.[2]

That May, after the city council elections, the council replaced chief Norman with Don Morris; Tommy Deal was hired as

---

[2] The medical examiner found no damage to the skulls or bones and was unable to determine the cause of death.

assistant chief. Both had been troopers with the Texas Department of Public Safety and had worked in an office in the Webster police department. Self had several encounters with Morris, before and after his appointment. While Morris was working as a security guard at an apartment complex, he accused Self of looking up girls' dresses as they walked up the stairs. He also talked to Self about gasoline thefts from city fire trucks, and threatened to jail him if he did not stop. (Self was a volunteer fireman and was often at the fire department, which was housed in the same building as the police department.) And, in early June, about a week before Self's arrest for Shaw's and Johnson's murders, Morris questioned him about possession of marijuana.

At around 5:00 a.m. on Friday, June 9, approximately three weeks after Morris and Deal took charge of the police force, Self was briefly questioned at his place of work about the murders. When he left work around 7:00 a.m., he agreed to go to the Webster police department for further questioning. After three hours of interrogation, he signed a written confession to the murders.

Self was then taken to nearby Houston, where he received a magistrate's warning; and Dewey Meadows, a Houston attorney, was appointed to represent him. Meadows advised Self not to speak to the police unless Meadows was present. Self told Meadows he wanted to take a polygraph examination to prove his innocence; Meadows advised against it.

That afternoon, Self was taken to the police department in nearby LaPorte, where charges were filed against him and nude

photographs made.  He then directed police to the location where the remains had been found.  Next, he was examined at a hospital. Late that afternoon, a Harris County Deputy Sheriff visited Self in his cell in Webster; Self denied any mistreatment.

The next day, Saturday, June 10, part of an interrogation of Self was taped.  Later that afternoon, he was moved to the county jail in Houston, where, the next Monday, June 12, he was questioned by various law enforcement officers about the murders of other girls in the area and given a polygraph examination.  After the examination, he signed a second confession to the murders.

Finally, on June 23, Self directed another Harris County Deputy Sheriff to the locations described in his June 12 confession, including the area where the remains had been found.

Self moved to suppress the June 9 and 12 confessions prior to trial in mid-1973 for Shaw's murder.[3]  During trial, after conducting an extensive hearing outside the presence of the jury, the state court entered findings of fact that both confessions were voluntarily given and admissible.  After the June 12 confession was admitted in evidence,[4] Self testified that the June 9 confession

_____

[3]    Self was also charged with Johnson's murder in a separate indictment; it was later dismissed.

[4]    Although only the June 12 confession was introduced, the contents of the June 9 confession were before the jury, primarily as the result of direct examination of Self.  Both confessions were introduced as exhibits in the state post-conviction hearings.

In closing argument, Self's counsel asserted that the state did not introduce the June 9 confession into evidence "because there are so many irregularities between the first and second one" and because it was coerced.  The prosecutor responded that Self could have introduced the June 9 confession, but not the state,

was coerced and that he would not have signed the second but for the first. Concomitantly, the jury was instructed that it could not consider the June 12 confession unless it found, beyond a reasonable doubt, that Self had been warned of his rights and had given the confession freely and "without compulsion or persuasion".[5]

The jury found Self guilty of murder, and sentenced him to life imprisonment in May 1973. The conviction was affirmed in December 1974 by the Texas Court of Criminal Appeals. *Self v. State*, 513 S.W.2d 832 (Tex. Crim. App. 1974).[6] That next November, Self's first state habeas application was denied by that court without written order. *Ex parte Self*, Application No. 5383 (November 26, 1975). And, his first federal application was dismissed in late 1978 for failure to exhaust state remedies. *Self v. Estelle*, No. 75-H-2186 (S.D. Tex., September 21, 1978).

A few months later, in January 1979, Self filed his second state application. That March, at the state's request, the state

---

because the officer who warned Self prior to that confession was not available to testify.

[5] The jury was instructed that the confession would not be voluntary if

> any officer threatened to ... beat [Self] or in any manner coerced [Self] or used any improper influence on [Self], and that [Self], through fear or under duress or under any other improper influence was thereby induced to sign such a statement....

[6] It rejected Self's contention that the June 12 confession was inadmissible because it was made outside the presence of his counsel, concluding that he had validly waived that right. 513 S.W.2d at 837-38.

court (the presiding judge at trial) ordered an evidentiary hearing on the issue of effectiveness of counsel. Between June 1979 and December 1980, it heard testimony on 14 days[7]; and the scope of the hearing was expanded to include the voluntariness of Self's confessions. In addition to the testimony, the habeas record included, *inter alia*, the direct appeal record. In May 1981, the state judge entered detailed findings of fact and conclusions of law, recommending that the writ be denied. Ten months later, the Texas Court of Criminal Appeals denied this second application without written order on the findings of the trial court. ***Ex parte Self***, Application No. 5383 (February 24, 1982).

In his second federal application, filed three years later in February 1985, Self sought relief on three grounds: (1) involuntary confession[8]; (2) suppression of exculpatory evidence; and (3) ineffective assistance of trial counsel. The magistrate judge ordered an evidentiary hearing, but cancelled it after both parties agreed that it was unnecessary, because the issues could be determined on the state record.

---

[7] Two of the hearings were devoted to an April 1980 confession to the murders by Patrick Heffernan. The record amply supports the state finding that he did not commit them. As that court noted, his story was completely unrealistic.

[8] Self claimed that "the introduction of the June 9, 1972 statement at trial was in violation of the Fifth Amendment". As stated, that confession was not admitted into evidence; and the state and district courts properly interpreted Self's claim as referring to the June 12 confession. Self did not claim in his petition that the confession was also obtained in violation of the Sixth Amendment, but later briefed that issue.

In a 39-page opinion, the magistrate judge recommended in August 1990 that relief be granted, on the ground that Self's conviction resulted from involuntary confessions, obtained in violation of his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel. But, it found that the suppression of evidence and ineffective counsel claims were meritless.[9]

After conducting a *de novo* review of the state's extensive objections and the record, the district court in March 1991 adopted the recommendation.[10]

## II.

### A.  Applicable Law

"Th[e] interest in federalism recognized by Congress in enacting § 2254(d) requires deference by federal courts to factual determinations of all state courts." *Sumner v. Mata*, 449 U.S. 539, 547 (1981). That section provides for a presumption of correctness for those findings, subject to specific exceptions. One is when, based on review of the pertinent part(s) of the record, the district court "concludes that such factual determination is not fairly supported by the record". 28 U.S.C. § 2554(d)(8).[11]

---

[9]    Self did not challenge their denial.

[10]    It stayed execution of its judgment pending appeal by the state, but granted Self's motion for immediate release upon posting bond.  This court stayed his release, in part because of the Supreme Court's just released opinion in *Arizona v. Fulminante*, __ U.S. __, 111 S. Ct. 1246 (1991); and subsequently, the parties were requested to brief its application.  *See* note 15, *infra*.

[11]    Section 2254(d) states:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, *shall be presumed to be correct*, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit--

    (1) that the merits of the factual dispute were not resolved in the State court hearing;

    (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

    (3) that the material facts were not adequately developed at the State court hearing;

    (4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

    (5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

    (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

    (7) that the applicant was otherwise denied due process of law in the State court proceeding;

    (8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such

- 8 -

## 1. Standard of Review

We freely review the district court's legal conclusions, *Johnson v. Puckett*, 929 F.2d 1067, 1070 (5th Cir.), *cert. denied*, ___ U.S. ___, 112 S. Ct. 274 (1991); but "[t]he factual findings of a federal district court in a habeas action should not be set aside unless they are clearly erroneous."[12] *Guzman v. Lensing*, 934 F.2d 80, 82 (5th Cir. 1991); *see also* *Amadeo v. Zant*, 486 U.S. 214, 223 (1988). However, it is well-settled in this circuit that the clearly erroneous standard of review does not apply to factual findings that result from an incorrect application of governing

> factual determination, is produced as provided for hereinafter, and *the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record*:
>
> And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, *or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination,* the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

28 U.S.C. § 2254(d) (emphasis added).

[12] A finding of fact "`is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). *See* Fed. R. Civ. P. 52(a).

- 9 -

legal standards. *E.g.*, **Matter of Bradley**, 960 F.2d 502, 507 (5th Cir. 1992); **Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.**, 659 F.2d 695, 703 (5th Cir. Unit A 1981), *cert. denied*, 457 U.S. 1126 (1982).

As stated, the state findings, including for the motion to suppress and the habeas application,[13] are presumptively correct unless they are not "fairly support[ed]" by the record, or another of the exceptions applies, or Self establishes "by convincing evidence" that they are erroneous. 28 U.S.C. § 2254(d). Accordingly, if the district court has made factual findings that are based on an incorrect application of the § 2254(d) governing standard, those findings are not subject to the clearly erroneous standard of review. Thus, in reviewing the district court's factual findings for clear error, we must first determine whether it properly applied § 2254(d) in making them.

In **Marshall v. Lonberger**, 459 U.S. 422 (1983), in comparing the deference due state findings with the clearly erroneous standard applied to federal findings, the Court stated: "We greatly doubt that Congress, when it used the language `fairly supported by the record' considered `as a whole'[,] intended to authorize broader federal review of state court credibility determinations than are authorized in appeals within the federal system itself." *Id.* at 434-35. Moreover, the district court may not dispense with the presumption of correctness without providing

---

[13]    *See also* note 6, *supra*, for the finding on direct appeal by the Texas Court of Criminal Appeals that the June 12 confession was admissible.

"at least some reasoned written references to § 2254(d) and the state-court findings". *Sumner v. Mata*, 449 U.S. at 549. It must therefore "include in [an] opinion granting the writ the reasoning which led it to conclude ... that the state finding was `not fairly supported by the record.'" *Id*. at 551.

Finding in several respects that the state findings were not supported by the record, the district court held, *inter alia*, that Self was illegally arrested; and that his June 9 and 12 confessions were involuntary and obtained in violation of the Fifth and Sixth Amendments, in part because he did not waive his rights. Although "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination", *Miller v. Fenton*, 474 U.S. 104, 112 (1985), we accord "great weight to the considered conclusions of a coequal state judiciary". *Hawkins v. Lynaugh*, 844 F.2d 1132, 1137 (5th Cir.), *cert. denied*, 488 U.S. 900 (1988) (footnotes omitted; citing *Miller*, 474 U.S. at 112).[14] Whether a defendant waived his constitutional rights is an issue of federal law, and not a question of fact. *Brewer v. Williams*, 430 U.S. 387, 397 n.4 (1977). Nevertheless, while "the ultimate issue of

---

[14]    The Supreme Court was recently asked to reconsider its statement in *Miller v. Fenton* that mixed constitutional questions are "subject to plenary federal review" in habeas proceedings. *Wright v. West*, __ U.S. __, 112 S. Ct. 2482, 2491 (1992) (quoting *Miller*, 474 U.S. at 112). The Court requested additional briefing on the issue, *id*. at 2486, but ultimately concluded that it need not decide it, because, "[w]hatever the appropriate standard of review, ... there was more than enough evidence to support West's conviction." *Id*. at 2492.

`voluntariness' is a legal question requiring independent federal determination", "subsidiary factual questions, such as ... whether in fact the police engaged in the intimidation tactics alleged by the defendant are entitled to the § 2254(d) presumption." *Miller v. Fenton*, 474 U.S. at 110, 112 (citations omitted); *see also Lavernia v. Lynaugh*, 845 F.2d 493, 500 (5th Cir. 1988) (underlying determinations of historical fact that must be made in order to answer a mixed question of law and fact are properly accorded a presumption of correctness).  Other subsidiary factual questions entitled to the presumption of correctness include "the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings, [because they] often require the resolution of conflicting testimony of police and defendant".  *Id*. at 117.

### 2.  Fifth Amendment Privilege Against Self-Incrimination

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself". U.S. Const. amend. V.  Both before and after holding that the Fifth Amendment privilege against self-incrimination applies to state action, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964), and in the context of custodial interrogations, *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), the Supreme Court has applied the Due Process Clause of the Fourteenth Amendment to prohibit states from securing criminal convictions through the use of involuntary confessions resulting from coercive police conduct.  *See, e.g., Miller v. Fenton*, 474

U.S. at 109; **Brown v. Mississippi**, 297 U.S. 278 (1936).  The test

for determining voluntariness is well-established:

> Is the confession the product of an essentially
> free and unconstrained choice by its maker?  If it
> is, if he has willed to confess, it may be used
> against him.  If it is not, if his will has been
> overborne and his capacity for self-determination
> critically impaired, the use of his confession
> offends due process.

**Schneckloth v. Bustamonte**, 412 U.S. 218, 225-26 (1973).  And

pursuant to **Jackson v. Denno**, 378 U.S. 368 (1964), a defendant who

challenges the voluntariness of a confession sought to be used

against him at trial has a due process right to "a fair hearing in

which both the underlying factual issues and the voluntariness of

his confession are actually and reliably determined".  **Id**. at 380.

At such a hearing, "the prosecution must prove at least by a

preponderance of the evidence that the confession was voluntary".

**Lego v. Twomey**, 404 U.S. 477, 489 (1972).  Here, after conducting

a **Jackson v. Denno** hearing, the state court concluded that the June

9 and 12 confessions were voluntary and admissible.

In addition to the due process prohibition against the use of

coerced confessions, the now-familiar procedural safeguards

established in **Miranda** also protect an accused's Fifth Amendment

privilege against self-incrimination during custodial

interrogation.  *See* **Michigan v. Tucker**, 417 U.S. 433, 444 (1974).

Prior to custodial interrogation, the subject must be informed

that:  he has the right to remain silent; anything said can and

will be used against him in court; he has the right to consult with

counsel prior to questioning, and to have counsel present at the

interrogation; and if he cannot afford an attorney, one will be appointed. *Miranda*, 384 U.S. at 468-70, 479. And, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease". *Id*. at 473-74. Likewise, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present". *Id*. at 474. "The sole concern of the Fifth Amendment [privilege], on which *Miranda* was based, is governmental coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). The "voluntariness" determination is designed to determine the presence of such coercion. *Id*. at 168. Nevertheless, a *Miranda* violation "does not mean that the statements received have actually been coerced, but only that the courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised." *Oregon v. Elstad*, 470 U.S. 298, 310 (1985).

This court has held that "there is nothing inherently wrong with efforts to create a favorable climate for confession. Neither `mere emotionalism and confusion,' nor mere `trickery' will alone necessarily invalidate a confession". *Hawkins v. Lynaugh*, 844 F.2d at 1140 (footnotes and citations omitted). But, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to ... counsel". *Miranda*, 384 U.S. at 475. As the Supreme Court

explained in **Moran v. Burbine**, 475 U.S. 412, 421 (1986), the waiver inquiry has "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id*. at 422. As noted, the state bears the burden of proving by a preponderance of the evidence that a defendant has waived the protections established by **Miranda**. **Colorado v. Connelly**, 479 U.S. at 168-69.

> An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.

**Miranda**, 384 U.S. at 475.

### 3. Sixth Amendment Right to Counsel and Its Waiver

The Fifth Amendment right to counsel during custodial interrogation is distinct from that under the Sixth Amendment, which attaches at the commencement of formal judicial proceedings against an accused and applies regardless of whether the accused is in custody. *See* **Brewer v. Williams**, 430 U.S. at 398 ("[T]he right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him

- 15 -

-- `whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'"). In *Massiah v. United States*, 377 U.S. 201 (1964), the Supreme Court held that the Sixth Amendment is violated when a defendant's "own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel", were used against him at trial. *Id*. at 206. It is undisputed that Self's Sixth Amendment right to counsel attached well in advance of his June 12 confession.

To establish a valid waiver of this right, the state must prove "an intentional relinquishment or abandonment of a known right or privilege". *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Brewer v. Williams*, 430 U.S. at 404. The waiver inquiry is dependent "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused". *Johnson v. Zerbst*, 304 U.S. at 464. Moreover, "courts indulge in every reasonable presumption against waiver". *Brewer v. Williams*, 430 U.S. at 404. "[T]he critical inquiry is whether the prosecution has sustained its heavy burden of establishing that [Self] was fully informed of and understood his rights and whether, having once expressed his decision to exercise them, he later changed his mind and knowingly and understandingly declined to exercise them." *United States v. Cavallino*, 498 F.2d 1200, 1202 (5th Cir. 1974). "Waiver by a defendant of his constitutional right to consult with or to have an attorney present does not require an express statement or disavowal. Waiver may be inferred

from the language, acts, conduct and demeanor of a defendant." *Id*. at 1204.

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court established a "bright-line" rule: "[A]n accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id*. at 484. The *Edwards* rule was developed for the Fifth Amendment; but, in *Michigan v. Jackson*, 475 U.S. 625 (1986), it was made applicable to the Sixth as well. "*Edwards* established a new *per se* rule and to that extent overruled *Johnson v. Zerbst*." *Solem v. Stumes*, 465 U.S. 638, 652 (1984) (Powell, J., concurring). Accordingly, the rule does not apply retroactively and is, therefore, unavailable to Self. *Solem v. Stumes*, 465 U.S. at 650.

Nevertheless, Self contends that, prior to *Edwards*, this circuit held that once the right to counsel had been invoked, questioning could not resume unless the suspect initiated the contact. He relies on *United States v. Priest*, 409 F.2d 491 (5th Cir. 1969), in which the court stated: "Where there is a request for an attorney prior to any questioning, ... a finding of knowing and intelligent waiver of the right to an attorney is impossible". 409 F.2d at 493.

Subsequent cases interpreting *Priest* make it clear, however, that the language relied on by Self is not as absolute as it seems. In 1979, our en banc court resolved the apparent variance: "We

- 17 -

construe *Priest* to bar inquiry as to waiver when, prior to any questioning, the suspect makes an unequivocal request for an attorney's presence, as was done in *Priest*, and when the request is disregarded and the questioning proceeds." ***Nash v. Estelle***, 597 F.2d 513, 517 (5th Cir.) (en banc), *cert. denied*, 444 U.S. 981 (1979). Shortly thereafter, this was repeated in ***Blasingame v. Estelle***, 604 F.2d 893, 895 (5th Cir. 1979). Likewise, shortly before the 1979 en banc opinion, this court, in ***Government of Canal Zone v. Gomez***, 566 F.2d 1289 (5th Cir. 1978), cited ***Priest*** for the proposition that, when a suspect requests counsel during questioning, but the request is ignored and interrogation continues, "a knowing and intelligent waiver is very difficult, if not impossible, to establish." ***Id***. at 1291.

However, for cases such as this, to which ***Edwards*** is not applicable, when interrogation ceases after the accused requests counsel and then, after a period of time, resumes, "the question of whether the accused knowingly and intelligently waived his rights is a question that can be answered only on the facts of each case." ***Gomez***, 566 F.2d at 1291.

> Waiver has been found and the confession admitted when the interrogation was continued at the behest of the accused, and where intervening events between the denial of counsel and the later confession helped dissipate the taint of the earlier violation. *Central to the outcome of these cases was the belief that the suspect should not have been prevented from changing his mind once he had stated that he desired an attorney.*

***Id***. (emphasis added; citations omitted).

- 18 -

Other pre-*Edwards* cases decided after *Priest* make it clear that this circuit recognized that waiver is indeed possible *after* an accused has requested counsel. *See, e.g.*, *Biddy v. Diamond*, 516 F.2d 118, 122 (5th Cir. 1975), *cert. denied*, 425 U.S. 950 (1976) ("when a person knows her rights, and has even exercised the right to counsel, talking with counsel, later voluntary admissions can constitute a waiver of the rights to counsel and to remain silent"); *United States v. Cavallino*, 498 F.2d 1202, quoted above; *United States v. Hodge*, 487 F.2d 945, 947 (5th Cir. 1973) ("An arrestee can change his mind after requesting an attorney."); *United States v. Green*, 433 F.2d 946, 948 (5th Cir. 1970) ("The right to have counsel present can be waived."). The district court applied the correct, pre-*Edwards*, rule of law in determining waiver *vel non*.

Accordingly, in making our independent federal determination whether Self's confession was voluntary, the state findings are critical; and our focus is on whether the district court erred in holding that they are not fairly supported by the record. Because the district court differed with so many state findings, we must present a detailed analysis of the voluminous record, including the state habeas transcript of approximately 1,200 pages.

### B. Voluntariness of June 9 and 12 Confessions

#### 1. June 9 Confession

The district court held that Self's June 9 confession (not admitted into evidence) was involuntary, because it was the result

- 19 -

of (1) an illegal arrest; and (2) coercion, threats and physical force.[15]

### a. Arrest

Self never raised the legality of his arrest as an issue in any of the state court proceedings, before and after his conviction, and did not seek federal habeas relief on that ground. Nevertheless, the district court held that he was unlawfully arrested, and that his confessions were the fruits of that illegality. (Self neither responds to the state's argument that the district erred in so holding, nor attempts to defend that holding.)

Because Self did not challenge the legality of his arrest, the state had no reason to prove otherwise, and the Texas state courts had no opportunity to consider the issue. *See **Stone v. Powell***, 428 U.S. 465, 494 (1976) (a Fourth Amendment violation does not support habeas relief where state has provided an opportunity for full and fair litigation of the claim); *see also* § 2254(b), (c) (requiring exhaustion of remedies in state court before seeking federal habeas relief). Needless to say, the legality of Self's arrest was not properly before the district court and cannot form the basis for

---

[15] In **Arizona v. Fulminante**, ___ U.S. ___, 111 S. Ct. 1246, 1251 (1991), the Court held that the admission of a coerced confession is subject to harmless-error analysis. The state concedes that if the June 9 confession was coerced and the June 12 confession tainted by that coercion, the admission of the latter cannot constitute harmless error. Because the state finding that the June 9 confession was not coerced is fairly supported by the record, it is unnecessary to engage in taint and harmless-error analysis. In any event, the state habeas court found and concluded that the June 12 confession was not tainted by that of June 9. The record also fairly supports that finding.

relief. Moreover, the district court improperly relied on its *sua sponte* determination that Self's arrest was unlawful to support its conclusion that Self did not validly waive his Fifth and Sixth Amendment rights.

### b. Coercion

The district court acknowledged that the state court had twice found that no force or threats were used against Self to obtain his June 9 confession. Nevertheless, it found that the confession was so obtained and not freely given, despite **Miranda** warnings having been given. This finding is influenced by its earlier, unwarranted, *sua sponte* illegal arrest ruling, as well as by credibility choices contrary to those made by the state trial judge, who had an opportunity to observe the witnesses' demeanor, and whose province included weighing conflicting testimony.

### (1) Physical Force and Threats

The printed portion of the June 9 statement provides that Officer Morgan advised Self of his **Miranda** rights prior to questioning, and further recites:

> I want to answer law enforcement officers' questions and make this statement without the presence and advise [sic] of a lawyer, and I now freely give up and waive my rights to a lawyer and to remain silent and do make the following voluntary statement.

Self did *not* testify at the habeas hearing. The following is a summary of his suppression hearing testimony, regarding his June 9 confession. Chief Morris wanted to frame him for the murders, because he had allegedly called Morris vulgar names in a recorded conversation with former chief Norman; and he was afraid of Morris,

because Morris had previously threatened "to do everything he could to see me put in the penitentiary". When he asked for a lawyer, Morris replied, "You had your chance last week", referring to Self's waiver of a lawyer when questioned a week earlier about possession of marijuana. He repeatedly told the police that he had not murdered the girls, but Morris placed officer Morgan's night stick on the desk and threatened to beat him if he did not say what Morris wanted to hear. Self was handcuffed and sitting in a chair, and Morris took the stick with both hands and rammed it into his abdomen; when he doubled over, Morris hit him three or four times along the back and shoulders over a five to ten-minute period. Officers Morgan and Mitchell, who were present during the beating, walked to nearby windows and said to one another, "Let's look at the stray dogs wandering the street". Although he first testified that Morgan and Mitchell were in the room when Morris was questioning him, Self later testified that he was left alone with Morris, and that Morris took five bullets out of the chamber and spun it, held the gun near Self's head, and told him that he would kill him and say that he ran. Assistant chief Deal was not present during the beating. Deal, who knew about Self's prior psychiatric treatment, told him that if he would sign the confession, Deal would see that he got psychiatric help. He made up a story and signed the confession because he was frightened, not allowed to call a lawyer, had been beaten, and "just couldn't take any more". While at a hospital that afternoon for a physical examination, he observed marks on his stomach where Morris struck him; but he did

not tell the examining doctor that he was hurt or that he had been threatened and beaten, because Morris had threatened him with another beating if he did. He admitted that the bruises he allegedly received as a result of the beating cannot be seen in photographs taken that same afternoon, but explained that he does not bruise easily.[16]

Immediately thereafter, Self gave similar testimony to the jury, but there were several inconsistencies. Although he had testified at the suppression hearing that Mitchell and Morgan were present while Morris was beating him, he testified to the jury that Mitchell did not arrive at the police station until the afternoon of June 9, after the alleged beating, and that the physical abuse took place while he was alone with Morris. Admitting that this contradicted his earlier testimony, he testified that he did not know which version was correct.

At the suppression hearing, Robert Lee Fulkerson, Self's roommate when Self was arrested, testified that six to eight weeks prior to Self's arrest, Morris had told Fulkerson that "he was going to bust [Self] one of these days on anything that he could"; that Morris had previously displayed violence toward Fulkerson when Morris tried to accuse him of stealing; and that he knew of threats Morris had made to others.

During the habeas hearing, Dewey Meadows, one of Self's trial attorneys, gave the following testimony. Prior to being appointed

---

[16]    Morris testified that the examination and photographs were a precaution against a brutality charge.

chief, Morris had been transferred to Webster by the Department of Public Safety for disciplinary reasons involving mishandling of prisoners. When he met with Self shortly after noon on June 9, Self told him that the confession had been coerced, that he gave it because he was afraid. Self "indicated" that he was afraid of Morris, and that Morris was responsible for the coercion. Self said that he had been hit in the stomach with a billy club, and raised his shirt and asked Meadows to view his navel. It was pink, but not bruised; Meadows did not know whether this was from a blow or Self wearing a tight belt. But, Meadows' testimony at the suppression hearing six years earlier included no references to Self's claims of threats or beatings, nor did he testify about having viewed Self's navel on June 9.

Self's mother testified at the punishment phase of the trial and the state habeas hearing. At trial, she did not testify about any coercion, but gave the following testimony during the habeas hearing: Self is easily intimidated, cannot cope with pressure, and will say or do just about anything to get others to stop pressuring him; she was away on June 9 and 10, and when she saw Self on June 13, he looked like he belonged in a mental institution; Self started crying, raised his shirt, and said that Morris had punched him in the stomach and hit him in the neck with a club, and had pulled a gun on him and forced him to confess; and Self wanted her to thank Deal for being so nice to him -- Deal had promised to get psychiatric help for him if he would confess a second time.

- 24 -

Former Webster policeman David Coburn testified at the habeas hearing, but not at trial. According to Coburn, Self could be easily intimidated by authority; Morris was "a bully"; Self was afraid of Morris because Morris had threatened to "get" him; Morris did not like Self, because Self was having "some sort of a relationship" with Morris' wife; Morris bragged about abusing prisoners, and he had previously observed such abuse; Morris' activities with respect to handling prisoners had been the subject of several FBI investigations; and Morris was considered to be a violent person, whose demeanor around prisoners was "mean". Coburn concluded that it was likely that Self was afraid of being beaten or killed by Morris during interrogation.

On the other hand, during the habeas hearing, former Webster councilman Shapiro testified that Coburn was a heavy drinker and known for brutality toward prisoners, and that Morris was appointed chief in an attempt to improve the image of the Webster police, which had acquired a reputation for brutality under Coburn and Norman. The state habeas court found that Coburn's reputation for being a peaceable and law-abiding citizen was bad.

Jerry Mitchell, a United States Customs Service inspector and former Webster policeman, who did not testify at trial, offered the following testimony at the habeas hearing. He was present during portions of the June 9 interrogation; when he first saw Self, Self seemed relaxed and at ease, was more concerned with punishment than with guilt or innocence, and repeatedly claimed innocence; when he returned to the interrogation room 30-45 minutes later, Morris and

Self were alone; Morris had Morgan's 14 to 18-inch night stick in his hand, and Self seemed highly upset and nervous; Morris was slapping the stick repeatedly against the palm of his left hand and was being very forceful and threatening, and using profanity; and Morris indicated that Self could not leave the police station until he confessed. Mitchell was in the room for 15 to 20 minutes; and, although he did not see Morris hit, or point his revolver at, Self, he thought such events had probably (later he testified may have) occurred, because of Self's changed and shaken appearance, and because Morris had previously used a "Russian roulette" interrogation technique on another prisoner. Morris had a "mean streak" and Self was "very frightened" of Morris. Mitchell concluded that Self's confession was the product of psychological coercion and Self's fear of Morris, and that Self possibly confessed just to get away from Morris. Conversely, at the habeas hearing, Shapiro, who was a friend of Mitchell's in 1972 and at the time of the habeas hearing, testified that Mitchell had never mentioned that he had observed anything which led him to believe that Self's confession was involuntary.

Other witnesses who had not testified at trial testified at the habeas hearing. Webster fire chief Gaskins testified that he saw Self on the afternoon of June 9; Self told him that the police made him confess and he appeared frightened and was crying. Former Webster police dispatcher Bruce Wilburn testified that he had observed Morris abusing and mistreating other prisoners before Morris became a Webster police officer. Thomas Roberson, Self's

other trial attorney, testified that Self stated that Morris was "after him"; that Self was "quite scared" of Morris; and that Self told him about Morris removing bullets and playing "Russian roulette". Charles Miller, Self's employer at the time of his arrest, testified that he had witnessed Morris "brutalizing" a prisoner, and that Self was afraid of Morris.

Assistant chief Deal and chief Morris testified for the state at the suppression hearing and at trial. At the time of the habeas hearing, both were incarcerated; only Morris testified then (by deposition).[17] At the suppression hearing, Deal gave the following testimony. At approximately 5:00 a.m. on June 9, he and officer Morgan[18] went to where Self worked, read him his *Miranda* rights, questioned him about the murders, and left after about 20-25 minutes without placing him under arrest. Deal and Morgan next went to see Self at about 7:00 a.m.; he agreed to follow them to the police station; and they arrived there shortly after 7:00 a.m. Morgan administered the *Miranda* warnings to Self; Self did not request an attorney. Self was not taken before a magistrate prior to being interrogated, because Deal was unable to contact a judge; all were out of town at a convention. The interrogation lasted a little over three hours and was conducted by Deal, Morris, Mitchell, and Morgan. At least two officers were present while

---

[17]   Morris, Deal, and another Webster policeman who did not testify in any of the proceedings were convicted for bank robbery.

[18]   At the time of trial, Morgan was no longer employed by the Webster Police Department. He did not testify at the trial or habeas hearing.

Self was being interrogated.  Deal left around 8:00 or 8:30 a.m. and was absent about 30 minutes; other than that, he was present during the interrogation.  Self appeared nervous during the questioning, and he became emotionally distraught and cried at times.  He was not handcuffed and would have been permitted to go to the restroom.  After the confession was typed, it was shown to Self, and he appeared to read it; Morgan also read the statement to him.  At 10:10 a.m., Self signed the confession, in which he admitted murdering Shaw and Johnson.  Self "was not forced, coerced or in any way threatened or intimidated" into signing.  Self was then taken to Houston, and at 11:59 a.m. was advised about his rights  by Judge Duggan; Self requested that counsel be appointed to represent him, and Judge Duggan telephoned Meadows at 12:04 p.m.; Meadows arrived at the courthouse within minutes and conversed privately with Self; and, after talking to Meadows, Self said that he did not commit the murders.  He and Morgan left Houston that afternoon with Self and went to nearby LaPorte, where charges were filed against him and full-length, front and back, black-and-white nude photographs taken.  Self then directed them to the location where the remains had been found.  Self was then returned to the Webster police department.  About 15 minutes later, he was taken to Clear Lake Hospital for an examination.  On Saturday, June 10, Self was transferred to the Harris County Jail.  Deal gave similar testimony at trial.

At the suppression hearing, Morris denied threatening Fulkerson, and denied telling him that he would put Self in the

penitentiary. He testified that Fulkerson was upset with him because he would not hire Fulkerson as a police officer (Fulkerson had been convicted of theft in 1971 and was on probation) and because he had been unable to assist Fulkerson in collecting a reward for his assistance in providing information that led to Self's arrest. He denied threatening to put Self in the penitentiary and testified that he did not threaten or physically abuse Self with a pistol or night stick; that he was present when Self was examined at the hospital and did not see any marks around his navel; and that he did not threaten to beat Self if Self alerted the doctor. He did not recall being alone with Self on June 9. Morris testified similarly to the jury and, in addition, testified that he did not pick up Morgan's nightstick.

In his deposition taken in 1979 for the habeas hearing, Morris testified that, prior to the arrest for murder, he tried to scare Self after Self had stolen gas from the fire chief's car; he used the "good guy, bad guy" interrogation technique with Self on June 9, in which he was the "bad guy"; the technique did not involve any physical violence or brutality, and he did not make any threats or use any physical violence during the interrogation[19]; Self was frightened of him, but had no reason to be physically afraid; Self was nervous and intimidated, but no more so than any other subject

---

[19]     Bobby Harold Musser, an expert in polygraph examination, testified at the habeas hearing regarding the "good guy-bad guy" interrogation technique used on June 9. He stated that it utilizes psychological manipulation and poses dangers of abuse, but conceded that it was an accepted technique. Musser opined that it was likely that Self's June 9 confession was a result of Morris effectively overbearing Self's will to resist.

in an interrogation; Self did not fear him enough to confess to a murder that he did not commit; when Self was confessing his guilt, Self enjoyed telling about it; and his memory of events as reflected in his trial testimony was more accurate than at the time of his deposition, almost six and one-half years later.

Former Webster councilman and Harris County deputy sheriff Shapiro, whose testimony is discussed in part above, testified at the habeas hearing as follows. He saw Self and Morris conversing in Morris' office on the afternoon of June 9, and Self did not appear nervous or frightened. Prior to taking Self to the hospital to be examined, Shapiro asked him if he was hurt; Self replied that he was not. After the examination,[20] the doctor told Shapiro that Self was in good shape[21]; and Shapiro saw no physical signs indicating that Self's confession was involuntary. Morris was appointed on his recommendation as police chief for the purpose (noted above) of improving the image of the Webster police. Webster was a "hot bed of politics" in 1972, and, although Rhonda Johnson's grandfather, who ultimately was elected mayor, was politically influential, the police department's failure to solve the murders had nothing to do with the appointment of a new chief. Although Shapiro was formerly friendly with Morris, his opinion of

---

[20]    Shapiro's testimony about the examination is inconsistent with Morris'. Morris testified that he was present and observed the examination, but Shapiro testified that Morris was not there, and that he did not know whether anyone else was inside the examination curtain with Self and the doctor.

[21]    Concerning the information provided by the doctor, see note 22, infra.

Morris had changed as of the habeas hearing, based on Morris' conviction and Morris having made advances toward Shapiro's wife. Nevertheless, Shapiro maintained his belief that Self's confession was voluntary.

The testimony of other witnesses supports the state finding that Self was not coerced. Dr. Davis, who worked in the hospital emergency room on June 9, testified at the suppression hearing that, although he did not conduct the examination, he saw Self that afternoon and did not observe him making any complaints regarding physical or other problems.[22] Harris County deputy sheriff Cleboski testified at the habeas proceeding that he visited with Self on the afternoon of June 9. He asked Self if he had been abused, threatened, or mistreated, or if any coercion or trickery had been used to obtain his statement; Self answered with "a very clear negative".[23]

At the conclusion of the suppression hearing, in written findings of fact, the state court found that Self had been given *Miranda* warnings prior to making the June 9 confession and understood his rights; he "had not been mistreated, physically abused, threatened in any way or manner, or promised anything of any kind or nature ... to induce ... [the June 9] statement"; and he "gave no appearance at any time prior to the making of the [June 9] statement ... of exhaustion, of hunger, of thirst and made no

---

[22]  Dr. Davis was chairman of the emergency room committee and signed the examination note; he testified that Self was examined by an unknown doctor, probably a medical school resident.

[23]  Cleboski did not testify at trial.

request for food, drink or rest" and "was permitted to go to the restroom whenever he desired to do so".  It stated that its findings were "based not only upon the testimony of the witnesses, but also upon this Court's personal observation of the demeanor and manner in which each witness testified."  It concluded:

> Considering all of the facts and findings and chain of events concerning this case and the written statements given herein, this Court is convinced beyond a reasonable doubt that the written statements were each freely and voluntarily made by ... Self, after he was warned of his constitutional and statutory and legal rights, which rights he fully understood and knowingly and intelligently waived.

At the conclusion of the habeas hearing, the same judge made the following findings with respect to brutality allegations:

> No physical or psychological coercion or intimidation was perpetrated upon [Self] by ... Morris ....  Specifically, [Self] was not jabbed in the stomach with a nightstick nor struck across the shoulders with a nightstick, by Chief Morris. Chief of Police Morris had not practiced similar acts of physical abuse on other prisoners as chief of police in Webster or as a Department of Public Safety officer.

> ... Chief Morris did not empty all the bullets save one from his service revolver and place the weapon to [Self]'s head.  Similar methods of physical abuse were not practiced by Chief Morris upon other individuals in his custody.  No conduct of Chief Morris rendered [Self]'s written confession of June 9, 1972, involuntary under the Constitutions of the United States or Texas.

> * * *

> ... There is no evidence of perjured testimony by former Police Chief Don Morris and former Assistant Police Chief Tommy Deal, *both of whom are now in federal penitentiaries for bank robbery*.  There has been no connection shown between the instant offense by [Self] and the

- 32 -

offenses of which these former law enforcement officers were convicted.

... At his deposition taken in this proceeding ..., former Police Chief Don Morris testified under oath that he knows of nothing to which he testified at [Self]'s trial that was untrue. There is no testimony at this proceeding to outweigh that of former Police Chief Don Morris, at trial, or that of former Assistant Police Chief Tommy Deal, at trial. *Particularly, the Court finds: Chief Morris did not testify falsely when he stated that he did not pick up a nightstick or hold it in his hand while questioning [Self] the morning of his arrest and shortly before he gave his first confession.* Chief Morris did not falsely testify that he had not abused or brutalized other prisoners in the past. Chief Morris did not beat [Self] at the Webster Police Station the morning of his arrest. [Self] did not make his first or second statement as a result of physical or mental coercion of any kind.

(Emphasis added.)

Despite these findings, the district court credited Self's testimony that Morris struck and threatened him during the June 9 interrogation, as well as testimony from other witnesses that Morris had mistreated other prisoners. It stated that the state court failed to accord sufficient weight to the character traits of Morris and Deal, because of their convictions for bank robbery,[24]

---

[24]  The very scant evidence in the record about the convictions reflects that Morris and Deal may have been robbing banks in mid-1972, when Self was arrested, and that Morris was arrested in 1975 for such activity. There is no comparable evidence about when Deal was arrested, but it appears that he was arrested before Morris. (In addition, Mitchell testified at the habeas hearing that, in 1974, Deal told him that he was using drugs; but Mitchell did not know if Deal was doing so in 1972 or 1973.)

The magistrate judge's understandable disdain for such illegal activity, especially by law officers, appears to have improperly colored his application of the § 2254 standard of review. For example, he refers to Morris and Deal as "officer-cum-bank robber" and states that Shapiro was "instrumental in hiring the bank

- 33 -

and also faulted it for failing to give any weight to the testimony of Coburn, Mitchell, Gaskins, Wilburn, and Miller regarding Morris' interrogation techniques.

Deference to a state court's findings is particularly important "where a federal court makes its determination based on the identical record that was considered by the state appellate court". *Sumner v. Mata*, 449 U.S. at 547. As stated in *Marshall v. Lonberger*, "§ 2254[d] gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." 459 U.S. at 434; *see also* *Louis v. Blackburn*, 630 F.2d 1105, 1110 (5th Cir. 1980) ("In order to adequately determine the credibility of a witness ..., the fact finder must observe the witness.").

Implicit in the state findings (as well as the jury's verdict) is a determination that Self was not credible. "When ... a trial court fails to render express findings on credibility but makes a ruling that depends upon an implicit determination that credits one witness's testimony as being truthful, or implicitly discredits another's, such determinations are entitled to the same presumption of correctness that they would have been accorded had they been made explicitly." *Lavernia v. Lynaugh*, 845 F.2d at 500. The state court did take note of Morris' and Deal's convictions, but nevertheless found that there was "no testimony" at the habeas proceeding sufficient to outweigh their trial testimony. The

---

robbers". Simply put, the credibility choices based on the state record were for the state, not federal, judge, as discussed *infra*.

district court's disagreement with the credibility choices made by the state court and with the weight that court gave to the testimony of witnesses whose demeanor was observed by it, but not the district court, is an insufficient basis for disregarding the state findings and making contrary ones. The state findings are fairly supported by the record.

### (2) Falsities and Inconsistencies in Confessions

The district court also referred to three perceived falsities or inconsistencies between the two written confessions as evidence of coercion; but these findings are either not supported by the record, and therefore, clearly erroneous, or do not support an inference of coercion.

First, in describing where the bodies were hidden, the June 9 confession speaks of a "culvert"; the June 12, a "bayou". But, a photograph in evidence shows that the words "bayou" and "culvert" are equally descriptive of that location. And, both were used by witnesses to describe the area.

Second, Self's statement in the June 12 confession that he discarded the girls' clothing along the sides of Red Bluff Road is seemingly inconsistent with the fact that some clothing similar in appearance to that worn by them at the time they were last seen alive was instead found in the area surrounding the ditch where the bodies were hidden. Moreover, officers searched the sides of the road and did not find the clothing. However, this inconsistency does not evince coercion. To the contrary, it is reasonable to assume that Deal, whose interrogation led to the June 12

confession, and who participated in the June 9 interrogation, was familiar with the investigation that had been conducted, and knew where the clothing had been found approximately four months earlier.  If Self had been coerced into saying whatever would please law enforcement officials, it seems most unlikely that they would have allowed him to sign a confession that was inconsistent with the physical evidence.  And, it is possible that Self might have intended to say "Old Choate Road" rather than "Red Bluff Road".[25]  In any event, this inconsistency is a very shaky foundation upon which to find coercion.

And third, Self stated in the June 9 confession that he met Rhonda Johnson at a theater and then went to Sharon Shaw's house; in the June 12 confession, that he picked up Johnson along a road, and they picked up Sharon Shaw at a yacht club.  The district court found that the described events could not have happened, because the record contains nothing to indicate that the girls split up on August 4 and reunited in Self's car.  (In another seeming inconsistency, Self stated in his June 23 oral statement that he picked Rhonda Johnson up on the road, near a steak house.  However, a private investigator for Self's habeas counsel testified that the theater (June 9 confession) and steak house (June 23 statement) are in the same vicinity.)  The record is silent both on when the girls returned to Webster from their day trip to Galveston and whether

---

[25]    Red Bluff Road is the first road to the southwest of the ditch.  It intersects with a road running just north of where the bodies were hidden, which Self also stated he used.  This road appears to be named "Old Choate Road".

they separated before being reunited; but, it contains nothing to indicate that this did not happen.  Therefore, there is no evidence to contradict Self's statements.   (And, concerning where Self picked up Sharon Shaw, although the June 12 confession and June 23 statement appear to be inconsistent with the June 9 confession, this, again, does not show coercion.)

Moreover, the district court's implicit finding that Self fabricated the June 9 confession to avoid further physical abuse is inconsistent with other evidence, such as the fact that Self on two separate occasions directed two different law officers to the exact location where the remains had been found.  After viewing photocopies of the photographs introduced in evidence, it seems extremely unlikely that Self would have been able to do so merely by chance; the area where the remains were found was described as "very desolate".  (Nevertheless, when questioned about how he was able to pinpoint the exact location, Self testified that he "was just guessing".)  The state record refutes any inference that his confessions were false.

In sum, concerning coercion, several parts of the state record, especially Mitchell's claim about Morris' use of the night stick, are troubling; but, based on our review of the record, we conclude that it contains the requisite § 2254(d) fair support for the state findings.  Accordingly, the district court erred in concluding that Self's June 9 confession was coerced.

## 2. June 12 Confession

The district court held that the June 12 confession was obtained in violation of Self's Sixth Amendment right to counsel, and that Self did not validly waive that right for the June 12 interrogation.[26] These conclusions are based on its findings that: (1) the June 12 confession was not initiated by Self, as the state court found, but instead, by the police, due to the unethical interference of an unnamed district attorney; (2) Self did not have the mental capacity to intelligently waive his rights; (3) the coerced June 9 confession was used to obtain the June 12 waiver, and that waiver was tainted by Self's fear of continuing brutality; and (4) the police ignored Meadows' instructions that Self not be interrogated outside his presence, and Morris deliberately misled Meadows in an attempt to prevent him from speaking to Self shortly before he signed the June 12 confession.[27]

### a. Initiation of Contact with Officers

As discussed, *Edwards*' *per se* rule on initiation is inapplicable; but, in any event, whether the accused initiates

---

[26] The district court also held that Self's oral admissions to Deputy Beamer during the June 23 trip to the location where Self said he had hidden the bodies were inadmissible, because they were obtained in violation of his Sixth Amendment right to counsel. However, Self's counsel did not object to the admission in evidence of those statements. Moreover, Self has not alleged that he is entitled to habeas relief on the basis of the admission of his June 23 statements, nor does he attempt here to defend the district court's ruling. We note also that Beamer testified that Self did not request his attorney's presence on June 23, and that Self had been warned of his rights prior to the trip.

[27] The district court's conclusion that Self did not validly waive his rights is also fatally infected by its improper ruling that Self was illegally arrested.

contact with the police after the right to counsel has attached is a factor to be considered in determining whether the accused has waived that right. *Felder v. McCotter*, 765 F.2d 1245, 1249-50 (5th Cir. 1985), *cert. denied*, 475 U.S. 1111 (1986).

Concerning initiation, the state habeas court found: "On June 12, 1972, [Self] made the decision to take the polygraph test. It showed that some of the facts in his statement of June 9, 1972, were incorrect. He then initiated the making of another statement, correcting these inaccuracies and adding more details." The district court held that this finding "is not supported by the record". We disagree.

As noted, Meadows testified at the suppression hearing that, when he met with Self immediately after his appointment on June 9, he told Self that anything Self said could be used against him, and advised Self not to make any statements to officials unless he (Meadows) was present. Meadows further testified:

> [S]omething was said about a polygraph test and I told [Self] at the time that I said [sic] it was against my advice that you take it. He says, "But I want to take it because I didn't do it". I said, "If you want to take that okay, but my advice is not to." And he said, "I'm going to go ahead and take it", and I said, "Okay."

On this point, Deal testified at the suppression hearing and trial as follows. On June 12, beginning at approximately 1:00 p.m., Self took a polygraph examination and was interviewed by several area law enforcement officials concerning the unsolved

murders of other young girls in the area.[28]  After taking the
examination, Self agreed to give an additional statement, because
he had left out some details in the first.  Deal, the only Webster
officer present during the June 12 interrogation, warned Self of
his rights prior to asking any questions; and Self did not state
that he wanted his lawyer present.  The questioning began at 4:40
p.m.; Self signed the confession at approximately 6:00 p.m.  No
force, coercion, threats, or intimidation were used.

At the suppression hearing and trial, Self testified that,
around 4:30 or 5:00 p.m., Deal asked him if he wanted to change
some errors in the June 9 confession.  Self was not sure whether
Deal asked him if he wanted a lawyer, but he testified that he
asked Deal if Deal had talked to his (Self's) attorney.  Self did
not remember Deal's response.  Although he could not remember
whether Deal warned him of his rights prior to questioning him, he
testified that no one beat or threatened him; and that he "gave it
of [his] own free will and volition".  He further testified that he
had "no complaints" about the June 12 statement, but would not have
given it if he had not already given the first one.

The June 12 confession contains the following, indicating that
Self was aware of his right to have his attorney present:

> I do not want to consult with a lawyer
> before I make this statement, and I do not
> want to remain silent, and I now freely and
> voluntarily waive my right to a lawyer and to

---

[28]    As noted, the polygraph apparently indicated that Self had
been untruthful with respect to portions of his June 9 statement.

- 40 -

remain silent and make the following voluntary statement ....

In addition, the district court does not comment on the following language from that confession, which lends further support to the state finding that Self initiated the interrogation that led to it:

> Last Friday, June 9th, 1972, I gave a statement to Officer Tommy Deal, of the Webster Police Dept. *Since that statment [sic], I thought of some additional information that I wish to add to my first statement.* Therefore I wish to make a new statment [sic] and add the things that I had forgotten in my original staement [sic].

(Emphasis added.)

The district court's finding that Self did not initiate the June 12 contact is greatly influenced by its clearly erroneous finding that an unnamed district attorney unethically interfered with Self's exercise of his Sixth Amendment right to counsel, by directing the police to obtain a second confession after counsel had been appointed. At the habeas hearing eight years after the June 12 confession, Harris County Deputy Sheriff Cleboski, who was present during it, testified that the Webster police had given him the impression that there was something wrong with the first confession; that *perhaps* they had consulted with a prosecutor; and that he was not directed to take the statement by anyone from the district attorney's office, but "*presume[d]*" that if such direction had been given, it would have been to the Webster police. (Emphasis added.) Deal testified that he conferred with more experienced investigators from the Harris County sheriff's department prior to the June 12 interrogation; he did not mention

- 41 -

consulting with anyone from the prosecutor's office. Cleboski's testimony does not furnish a basis for the district court's finding of unethical conduct by an unnamed district attorney.[29]

Next, although the record does not contain any evidence concerning the actual administration of the polygraph examination or its results, Meadows' testimony supports the implicit state finding that it was administered at Self's request. Deal's testimony, as well as the above-quoted portion of the June 12 confession, fairly support the state finding that, as the logical sequence to that examination, Self prolonged the contact he had initiated by making the June 12 confession to add details and additional information to supplement his June 9 confession.

The district court failed to accord the deference required by § 2254 to the state court's finding that Self initiated the June 12 contact with police that resulted in his confession later that day.

---

[29] Based on Cleboski's unsupported "presumption", discussed above, the magistrate judge ruled:

> Since [the state] did not dispute Cleboski's uncontradicted assertion, the Court will *assume and finds* that a state's prosecutor requested the additional written confession from Self. This was, of course, a violation of the then existing disciplinary rules of the State Bar of Texas .... Despite the fact that the Assistant District Attorney requested that the second statement be taken, the Trial Judge found that Self had initiated the taking of the second [June 12] statement. *Obviously* the Assistant District Attorney reviewing the first [June 9] written confession recognized the apparent falsity of the girls allegedly leaving with Self from Shaw's home.

(Emphasis added.) Again, it appears that the magistrate judge went far beyond the standard of review permitted by § 2254.

## b. Mental Capacity for Waiver

At the conclusion of the suppression hearing, the state court made the following findings regarding Self's mental capacity:

> [T]he Defendant, Michael Lloyd Self, was twenty-three (23) years of age, was in good health, good physical condition, of sound mind and aware of what he was doing at the time he made and signed each of these statements. He had the ability to read and good command of the English language as demonstrated when testifying during this hearing.

And, at the conclusion of the habeas hearing, it made similar findings:

> [Self] was alert and mentally competent when he made this statement of June 9, 1972.
>
> * * *
>
> ... In 1972, he was below normal academically, and would have been classified by his schoolteacher mother as "a dull normal," this being above the level where he would have been placed in a special class. At the time of the taking of the statement of June 12, 1972, [Self] displayed mental alertness and understanding. At the time he was given his magistrate's warning by Judge Duggan, he displayed understanding and alertness requesting appointment of counsel. [Self]'s testimony and his demeanor at pretrial motions, at trial and at the punishment hearing, and his demeanor at the instant hearing, were heard and observed by the judge who writes these findings. That testimony and demeanor demonstrated mental alertness and understanding.
>
> ... [Self] was mentally competent at the time that he made his statement on June 9, 1972, and at the time he made his statement on June 12, 1972.

The district court's conclusion that Self did not validly waive his right to counsel is based in part on its findings that "[t]he testimony showed that [he] was a dull student and slow learner with minimal brain injury [, and that] he was pliant and easily intimidated by authority figures". Although those findings

- 43 -

are consistent with some of the state's, and are supported by the record, the district court failed to explain why it chose to disregard the other state findings regarding Self's ability to comprehend both the nature of his legal rights and the consequences of his decision to abandon them on June 9 and 12.

The district court did not hold an evidentiary hearing; its findings are based solely on the state record. Obviously, the state trial judge, who had an opportunity to observe Self during his testimony at the suppression hearing and trial, was in a much better position than the district court to evaluate Self's mental capacity to understand the nature of his rights and the consequences of a decision to waive them. The district court erred in disregarding state findings that are fairly supported by the record.

### c. Taint from June 9 Confession

The district court's conclusion that Self did not validly waive his right to counsel at the June 12 interrogation is based, in part, on its finding that the waiver was obtained as a consequence of the coerced June 9 confession and Self's fear of continuing brutality. We have found that the record fairly supports the state finding that the June 9 confession was not coerced. Accordingly, it does not affect the validity of Self's June 12 waiver.

### d. Police Interference

Finally, the district court held that Self's June 12 waiver was invalid because (1) the police ignored Meadows' command that

they refrain from questioning Self unless he was present; and (2) Morris impermissibly interfered with Meadows' attempt to represent Self on June 12, shortly before Self signed the confession at 6:00 p.m.[30]

### (1)  Counsel's Instructions to Police

Although Meadows had informed the police officers who were present in Judge Duggan's courtroom on June 9 that they were not to interview Self outside his presence, Meadows testified, as discussed earlier, that Self, contrary to his advice, stated that he intended to take a polygraph examination.  Deal testified that Self did not express any desire to have Meadows present during the June 12 interrogation, and the June 12 statement corroborates this. Self had no duty to follow Meadows' instructions to the police, just as he had no duty to heed Meadows' advice that he not submit to a polygraph examination.  Self was free to choose to forego Meadows' presence at the June 12 interrogation, and he did not need Meadows' permission to make that choice.  A defendant may waive his right to counsel without notice to counsel.  *Brewer v. Williams*, 430 U.S. at 405-06.

Self asserts that *Felder v. McCotter* is factually similar. Felder's counsel consulted with Felder "almost daily" and "explicitly instructed" police not to question Felder unless his counsel was present; the police agreed.  765 F.2d at 1246.

---

[30]  Without providing supporting facts or law, the magistrate judge stated that "[h]ad Self truly waived assistance from his counsel, Meadows would have been promptly notified by the authorities."

- 45 -

Nevertheless, a Houston officer, knowing that Felder was represented by counsel, initiated an interview with him without his counsel's presence or consent. This court rejected the state's argument that Felder had waived his Sixth Amendment right to counsel by failing to assert it after receiving *Miranda* warnings, holding that "the mere giving of *Miranda* warnings, after the accused through his lawyer has instructed the police not to interrogate him, does not sanction that interrogation." *Id*. at 1249. Meadows instructed the police not to interrogate Self unless he was present; in that respect, Self's case is similar to *Felder*; but, the similarity ends there. Unlike Self, Felder did not initiate the contact with police, nor did he express any desire to talk with police officers in the absence of his attorney. *Id.* at 1250.

Most important, however, "Felder had not acted in a manner inconsistent with his lawyer's instructions or advice". *Id*. at 1249. "[C]onsistent reliance upon the advice of counsel in dealing with the authorities" has been held to refute any suggestion of waiver. *Brewer v. Williams*, 430 U.S. at 404. Self did not consistently rely on Meadows' advice. Indeed, the record demonstrates that he consistently disregarded Meadows' specific advice that he not take a polygraph examination and not talk to the police. The June 12 confession was a continuation of the contact initiated by Self following the administration of the polygraph examination, conducted at his request.

- 46 -

This case is similar, in some respects, to **United States v. Brown**, 459 F.2d 319 (5th Cir. 1971), *cert. denied*, 409 U.S. 864 (1972). Brown spoke with her appointed attorney on the telephone for 15 to 20 minutes. *Id*. at 323. After the conversation, she told federal agents that the attorney had advised her to remain silent, but indicated that she had lost confidence in the attorney because he had not responded to a previous call. *Id*. She then confessed. This court held that, "[i]n the circumstances of this case a failure to invoke the right to counsel, which had just been exercised, demonstrates a waiver of that right". *Id*. There was no showing that Self had lost confidence in Meadows, but there is evidence that he disregarded Meadows' specific advice by choosing to submit to the polygraph examination. Although the amount of time that elapsed between Self's exercise of his right to counsel on June 9, and his failure to invoke that right on June 12, is greater than that in **Brown**, we similarly conclude that in the circumstances of this case, Self's failure to invoke the right to counsel, which he had recently exercised, is a valid and significant factor in the waiver analysis.

### (2) Police Delaying Tactics

At the suppression hearing, Meadows testified that he telephoned the Webster Police Department on the afternoon of June 12 to set up an appointment with Self (who was jailed in Houston) and spoke with Morris. Meadows first testified that he placed the call at 4:45 p.m., but later stated that "[i]t was around 5:30 or 5:45". During the habeas hearing, however, he testified that he

placed it at 3:00 or 4:00 p.m. According to Meadows' testimony at the suppression hearing, Morris discussed the case with him for about fifteen minutes (during the habeas hearing, Meadows testified that it lasted 15 to 30 minutes), and then told him that Self was then signing a statement. (Self signed at 6:00 p.m.) Meadows then called the Harris County Sheriff's Department in Houston and told the person who answered that he did not want Self "making any statements to anybody without me being there and the officer or whoever it was on the other end indicated he would not". Meadows testified at the habeas hearing that, in retrospect, he had the impression that Morris was trying to stall him so that he would not find out that Self was being interviewed.

Deal, who was present when Self signed the June 12 confession in Houston, testified at the suppression hearing that Meadows called the Harris County sheriff's department at about 6:05 p.m. on June 12 and told Deal that the police were not to talk to Self anymore unless he was present. Deal testified that, by the time he spoke with Meadows, Self had already signed the confession; and they complied with Meadows' request.

There is no state finding on this point. That Morris did not interfere is implicit in the other findings and is fairly supported by the record.[31]

---

[31] Morris did not testify about a telephone conversation with Meadows on the afternoon of June 12. In any event, although it is reasonable to assume that Morris knew that Deal was in Houston for Self's polygraph examination, and perhaps to assume that Morris knew that the first confession contained insufficient detail, making a second confession desirable, there is no evidence that Morris knew that Self was being interrogated and was moments away

- 48 -

### C.  Other District Court Errors

The magistrate judge's recommendation contains other errors, two of which are mentioned here, because they may have affected his recommendation, and the district judge's decision, to grant relief.

### 1.  June 10 Recorded Interview

First, the district court found that a recorded interview of Self on June 10 "[p]resumably ... contained no incriminating statements since it was never offered in evidence against Self"; but, it further found that, because the tape was never provided to Self's counsel, "it may well have contained exculpatory matters." The record does not support these assumptions.

Deal testified at trial that Self was interviewed, and part of the conversation taped, on Saturday, June 10.  After Deal so testified, Self's counsel asked him to furnish the tape, but Deal was not then employed by the Webster police department and did not have access to it.  And, in response to a question by Self's habeas counsel during the state habeas hearing, Meadows testified that he did not recall having been told that, during the June 10 interview, Self said that he removed the girls' clothing and put it in his car.  This reference to the contents of the tape suggests strongly that Self's state habeas counsel had heard the tape, or seen a transcript of it.[32]

---

from signing a second confession when Meadows called.

[32]  It thus seems likely that, if the tape contained exculpatory evidence, its contents would have been introduced during the habeas hearing.  Moreover, if Self said during the interview that he had removed the clothing and put it in his car, this statement could hardly be considered "exculpatory".

## 2. Evidence of Guilt

The district court also held that Self's June 12 confession "was the sole evidence implicating Self in the murders". It failed to give weight to evidence that, as discussed, Self twice led officers to the exact location where the remains were found, first on June 9, after his first confession, and again on June 23. Perhaps, as discussed in note 26 *supra*, it based this conclusion on its ruling that this evidence was illegally obtained, in violation of Self's Sixth Amendment right to counsel. Although the district court noted that Self's counsel failed to object at trial to this evidence, it failed to note that Self did not allege any constitutional error in its admission. Nor does Self raise this issue on appeal.

It is unclear whether these erroneous rulings had any impact on the decision to grant the writ. In any event, Self is not entitled to relief on the basis of either of them.

## III.

This is a disturbing case, especially in light of Morris' and Deal's convictions and Mitchell's claim about Morris' conduct during the June 9 interrogation (including supposedly slapping a nightstick in his hand). But, in cases such as this, where the district court does not conduct an evidentiary hearing and has only the state record before it, the deference that must be given to state findings, especially credibility choices, is all the greater and more necessary. For state habeas applications, pursuant to § 2254 and "our federalism", federal courts sit not as original

finders of fact, but instead to review only within the balanced boundaries of § 2254.

The state record fairly supports the state findings that Self was advised about, and understood, his rights prior to the June 9 and 12 interrogations, and freely and voluntarily chose not to exercise them. And, it is our "independent federal determination", based upon "the totality of the circumstances, [including the state findings, that] the challenged confession was obtained in a manner compatible with the requirements of the Constitution", *Miller v. Fenton*, 474 U.S. at 112; that Self validly waived his Fifth Amendment right at the June 9 interrogation, as well as his Fifth and Sixth Amendment rights at the June 12 interrogation.

For the foregoing reasons, the judgment of the district court is **REVERSED**, and the case is **REMANDED** for the entry of an order of dismissal.

**REVERSED AND REMANDED.**