IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-11089
_____


DAVID WAYNE STOKER,

Petitioner-Appellant,

versus

WAYNE SCOTT, Director, Texas
Department of Criminal Justice,
Institutional Division,

Respondent-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Texas
(92-CV-148)
_____

October 25, 1996

Before GARWOOD, JONES and EMILIO M. GARZA, Circuit Judges.[*]

GARWOOD, Circuit Judge:

Petitioner-appellant David Wayne Stoker (Stoker) appeals the
dismissal of his application for writ of habeas corpus challenging
his Texas capital murder conviction and death sentence.  Stoker
contends that the State failed to disclose certain evidence
favorable to Stoker in violation of its obligations under *Brady v.
Maryland,* 83 S.Ct. 1194 (1963), and that he received ineffective

_____

[*]     Pursuant to Local Rule 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

assistance of counsel at trial. We affirm.

**Facts and Proceedings Below**

On June 23, 1987, Stoker was indicted by a grand jury convened in Hale County, Texas, and charged with capital murder in the course of committing and attempting to commit a robbery in connection with the November 9, 1986, slaying of convenience store clerk David Mannrique (Mannrique). *See* Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 1995).

The evidence adduced during the course of the October 1987 trial held in Plainview, Texas, so far as is relevant to the present appeal, was as follows. On November 9, 1986, Gracie Sanchez (Sanchez) reported for work at the Allsup's Convenience Store in Hale Center, Texas, at approximately 5:50 a.m. Upon arriving, Sanchez noted that several customers were waiting in the store but were not being assisted with their purchases. Sanchez entered the store and found that the cash register drawers were open and all of the bills had been removed. Shortly thereafter, she noted that the back door to the store was open, and upon entering the storeroom found Mannrique, the night clerk, lying on the floor in a pool of blood. Although Mannrique was apparently still alive at the time that he was discovered, he had only a weak pulse and attempts by medical personnel to revive him were unsuccessful. After being transported to the local hospital, Mannrique was pronounced dead at 7:08 a.m. The medical examiner

2

testified at trial that Mannrique had been shot twice in the back and once at the top of the head, and that he died as a result of these wounds. The only evidence found at the scene was three spent .22 caliber shell casings retrieved from the storeroom floor.

In April 1987, Carey Todd (Todd), an associate of Stoker's, approached local law enforcement officers claiming that he believed that he could obtain possession of the weapon used to kill Mannrique. Todd testified that he was told that law enforcement would be interested in seeing the weapon if he could obtain it. On May 16, Todd obtained a .22 caliber Ruger automatic pistol claiming to have received it from Stoker to assist Stoker in killing two people, Ronnie and Deborah Thompson. Todd turned this weapon over to Texas Department of Public Safety Officer Claudie Hinkle (Hinkle). At that time, charges were filed against Todd for unlawfully carrying a weapon, although both Todd and Hinkle testified that these were sham charges filed to protect Todd. Todd also assisted law enforcement officers in recovering a fourth .22 caliber shell casing from Stoker's car on May 18, 1987.[1]

William Albrecht (Albrecht), an FBI firearms examiner, offered testimony concerning the findings of his examination of the Ruger

---

[1] During the guilt/innocence phase of the trial, the jury heard testimony indicating only that the fourth .22 caliber shell casing had been recovered from Stoker's car during an inventory search. At the punishment phase of the trial, testimony was offered to show that the inventory search was the result of Stoker's arrest for selling crystal methamphetamine to Todd during a "controlled buy" set up by Todd in cooperation with local law enforcement officers.

pistol, the shell casings, and a bullet removed from Mannrique's body during the autopsy. Albrecht testified that based upon his microscopic comparison of markings left on the shell casings by the firing pin, the four shell casings were fired by the Ruger pistol "to the exclusion of every other firearm." Albrecht further testified that he was unable to reach a positive conclusion regarding whether the bullet recovered from the deceased's body was fired by the Ruger pistol due to the rapidly changing microscopic characteristics of the pistol's barrel. However, he concluded that the bullet "was fired from a barrel of a weapon having rifling characteristics that are consistent with the rifling characteristics present in" the Ruger.

Peter J. Belcastro (Belcastro), an FBI fingerprint specialist, testified that two fingerprints on the grips of the pistol when compared with a fingerprint card bearing Stoker's prints "were made by one and the same person and could not have been made by any other."

Ronnie Thompson (Thompson), a friend of Stoker's, testified that Stoker had told him before the murder was reported in the media that he had "[k]illed that guy working at Allsup's," and that he had described to Thompson that he had shot him twice in the back and once in the head. Thompson also testified that he had known both Todd and Stoker to carry the Ruger pistol in the past. Deborah Thompson, Ronnie's estranged wife, testified that Stoker had also told her "that he had gotten in some debt, and he needed

some money, and he killed the man in the Allsup's store," indicating that he had shot the man three times. She also identified that Ruger pistol as belonging to Stoker. Another witness, Ronald Dean Hale (Hale), also indicated that he had seen Stoker in possession of the Ruger pistol, although he was unable to recall just when.

The defense offered the testimony of Billy Wayne Reed (Reed), a friend of Stoker's at whose house Stoker had lived for a time, who stated he saw the Ruger pistol in Stoker's possession between Thanksgiving and Christmas of 1986. Reed additionally testified that two or three weeks after Stoker's arrest, Todd had stated in response to a question from Reed: "'What have you heard, that I set him [Stoker] up? I did. I set him up to take a big fall.'" Reed did not disclose this information to authorities prior to the week of trial.

Danny Stoker, Stoker's brother, indicated that he had seen the Ruger pistol in Stoker's possession around the Christmas holidays. He further testified that Stoker had repaired the pistol in the past for Todd.

Following the presentation of evidence and summation in the guilt/innocence phase of the trial, the jury found Stoker guilty of capital murder. During the course of its deliberations, the jury sent only one written query to the judge requesting that the evidence submitted during trial be brought to the jury room, and asking, "is it possible to learn the exact date the empty cartridge

was found in David Stoker's car?"  The court sent the evidence to the jury room, and instructed the jury that it was bound by the evidence received during trial with respect to the date that the empty shell casing was discovered in Stoker's car.

At the punishment phase of the trial, the prosecution presented testimony by eight law enforcement officials  to the effect that Stoker's reputation in the community for being a peaceful, law-abiding citizen was bad.  The prosecution additionally offered the testimony of Dr. James P. Grigson (Grigson), a forensic psychiatrist, regarding future dangerousness. Grigson testified based upon a hypothetical tailored to the prosecution's version of the facts of the present case.  Grigson opined that an individual such as the one described in the hypothetical would "most certainly present a continuing threat to society," citing the "cold-blooded" nature of the killing and the apparent lack of remorse.  Grigson further offered:

> "Well, if you used the scale of, say, like one to ten with one being the psychopath that is only breaking minor rules, and as you move up the scale where you have more serious robbery, rape, assaultive, on up to murder, where you have complete disregard for another human being's life, if you place that at ten, the person you describe would probably go over the scale, or past the ten mark."

Grigson then concluded that the type of person described in the hypothetical would continue the same type of behavior in the future regardless of his setting.  On cross-examination, Grigson acknowledged that his conclusion was based purely on the hypothetical facts offered by the prosecution, and that he had

6

never examined Stoker, interviewed others acquainted with him, or investigated his personal history.

Following Grigson's testimony, the defense moved for a continuance in order to secure the appointment of a psychologist or psychiatrist to testify on Stoker's behalf. The court denied the motion for continuance and request for appointment of an expert on the grounds that it had been advised at the pre-trial hearing that the defense did not wish to have Stoker examined, and that nothing had changed since that time to justify the defense's delay in lodging this request with the court. The only evidence offered by the defense during the punishment phase was the testimony of Stoker's mother, Jo Ann Stoker. She testified that she had separated from Stoker's father when Stoker was sixteen, that Stoker had quit school to work so that his brothers could continue their education, and helped to care for his brothers and mother.[2]

Following its deliberations, the jury returned affirmative findings to the special issues submitted to them, and Stoker's punishment was assessed at death. On direct appeal, Stoker's conviction and sentence were affirmed by the Texas Court of Criminal Appeals. *Stoker v. State*, 788 S.W.2d 1 (Tex. Crim. App. 1989), *cert. denied*, 111 S.Ct. 371 (1990). The trial court scheduled Stoker's execution to be carried out on August 15, 1991.

Stoker, represented by new counsel, filed a Post-Conviction

---

[2] Stoker did not testify at any phase of his trial. Nor did he testify at any of the subsequent evidentiary hearings in the state and federal courts.

7

Application for Writ of Habeas Corpus in the state trial court on May 23, 1991, urging twenty-one points of error. The state filed no response and the trial court made no findings of fact or conclusions of law. On August 8, 1991, the Texas Court of Criminal Appeals issued an order staying Stoker's execution and remanding to the trial court for an evidentiary hearing on claims that: (1) Stoker had received ineffective assistance of counsel at trial; (2) the prosecution had failed to disclose that Todd had received the dismissal of an unrelated charge in exchange for his testimony; (3) the prosecution had failed to disclose that Todd and Deborah Thompson received cash payments as rewards for their assistance in the Stoker's prosecution; and (4) the prosecution had knowingly used perjured testimony at trial. The trial court was directed to enter findings and conclusions with respect to these four allegations and to "also enter any further findings of fact and conclusions of law which it deems relevant and appropriate to the disposition of applicant's remaining seventeen allegations." The trial court held evidentiary hearings on December 12, 1991, and January 27, 1992. On March 6, 1992, the trial court issued its extensive Findings of Fact and Conclusions of Law recommending that all relief be denied. The Texas Court of Criminal Appeals issued an order on April 20, 1992, denying the Application for Writ of Habeas Corpus. The court stated: "This Court has reviewed the record. The findings of fact and conclusions of law entered by the trial court are supported by the record and upon such basis the

8

relief sought is denied."

On July 2, 1992, Stoker, represented by his same habeas counsel, filed the instant Petition for Post-Conviction Writ of Habeas Corpus and Application for Stay of Execution in the United States District Court for the Northern District of Texas, Lubbock Division. Stoker's stay request was granted, and an order issued referring the matter to a magistrate judge. Stoker filed an amended habeas petition in October 1992. On February 1, 1993, an evidentiary hearing was set for March 24, 1993, but was postponed on Stoker's motion. The evidentiary hearing was eventually held October 19 and 20, 1993, before the magistrate judge. On July 11, 1994, the magistrate judge filed his report with the district court recommending that all relief be denied and the petition dismissed with prejudice. After being granted extensions, Stoker filed objections to the magistrate judge's report on September 23, 1994. On October 19, 1994, the district court entered an order reciting that it had considered Stoker's objections and, on de novo review of the record, approved and adopted the magistrate judge's findings, conclusions, and recommendation. The court denied all relief and dismissed the petition with prejudice. A motion to alter or amend the judgment was subsequently denied. The district court issued a certificate of probable cause on December 5, 1994.

## Discussion

I. *Brady* Issues

It is a basic and well-established proposition that the

9

prosecution's suppression of evidence favorable to the accused violates the Due Process Clause if it is material to either guilt or punishment. *Brady*, 83 S.Ct. at 1196-97. The prosecution's constitutional duty not to suppress embraces both exculpatory and impeachment evidence. *United States v. Bagley*, 105 S.Ct. 3375, 3380 (1985). The promise of a reward, a more favorable disposition of pending criminal charges, or other inducements in order to secure the testimony of a witness goes to that witness's credibility, and therefore triggers the prosecution's duty to disclose under *Brady*. *See Giglio v. United States*, 92 S.Ct. 763 (1972)(promise of nonprosecution); *Kopycinski v. Scott*, 64 F.3d 223 (5th Cir. 1995)(payment of $1000 Crimestoppers reward); *Black v. Collins*, 962 F.2d 394 (5th Cir.)(reduced plea agreement), *cert. denied*, 112 S.Ct. 2983 (1992).

Of course, a new trial is required only if the evidence is material. As the Supreme Court recently explained, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 115 S.Ct. 1555, 1566 (1995). For this purpose, the cumulative effect of all *Brady* violations is to be evaluated. *Kyles* at 1569.

Stoker asserts that the prosecution failed to comply with its obligations under *Brady* by failing to disclose (1) the dismissal of pending drug possession charges against Todd in a neighboring

10

county in exchange for his testimony; and (2) the payment of a $1000 Crimestoppers reward to Todd and Deborah Thompson.

A.    Dismissal of Pending Drug Charges Against Todd

At the pretrial hearing of August 31, 1987, the state district court specifically instructed the district attorney to provide defense counsel with the criminal records of any prospective witnesses including convictions for felonies or crimes involving moral turpitude as well as any charges pending against such witnesses at that time.  The prosecution submitted to the defense a criminal history report on Todd prepared by the Texas Department of Public Safety dated December 10, 1986.  The most recent entry on this criminal history report was a November 23, 1986, arrest by the Amarillo, Texas, Police Department for unlawfully carrying a weapon.  However, Stoker submitted to the state habeas court the incident report prepared by the arresting officer which reflected that Todd had not only been arrested for unlawfully carrying a weapon, but also for possession of amphetamines and marihuana discovered during an inventory search of Todd's vehicle.  Stoker also introduced a copy of the Potter County, Texas, criminal complaint dated November 24, 1986, charging Todd with possession of a controlled substance.  This charge did not appear on the criminal history report submitted to the defense.  Stoker additionally submitted the Potter County district attorney's announcement of February 27, 1987, that he was ready to proceed to trial in Todd's case, a letter from Todd's attorney Thomas Paige Brittain

11

(Brittain) to the Potter County court indicating that he represented Todd, and a motion filed on August 31, 1987, by Potter County assistant district attorney Ebelardo Lopez (Lopez) requesting that the charge be dismissed because "[t]he State is unable to connect beyond a reasonable doubt the controlled substance to this Defendant."

Stoker maintains that the prosecution failed to disclose that the drug charge then pending against Todd in Potter County was dismissed in exchange for Todd's testimony against Stoker. The state habeas court entered the following findings of fact in this respect:

> "36. Applicant's fifteenth claim, in which he alleges that the State failed to reveal that Carey Todd had been granted a dismissal of a felony drug charge in Potter County in exchange for his assistance in the case, was the subject of a postconviction evidentiary hearing. Based on the evidentiary hearing testimony, this court finds that the record does not support applicant's contention that the Potter County drug charge against Carey Todd was dismissed in exchange for his testimony against applicant.
>
> 37. In response to applicant's fifteenth allegation, Ebelardo Lopez, Potter County assistant district attorney in 1987, testified at the evidentiary hearing that the outstanding Potter County drug charge against Carey Todd was dismissed because there was insufficient evidence to prosecute. The dismissal motion shows the case was dismissed for insufficient evidence and the dismissal was granted by Naomi Harney on the 31st day of August, 1987. Randall Sims, first assistant Potter County district attorney, testified that his judgment as a prosecutor would have led him to dismiss the Potter County charge against Todd because the evidence was

12

> insufficient to link Todd to the drugs found. This court finds the testimony and explanation by Mr. Lopez and Mr. Sims for the dismissal of the Potter County drug charge against Carey Todd to be credible. The court further finds that Mr. Lopez was aware that Mr. Todd was a witness in the case against applicant in Plainview. The applicant and his counsel at trial were aware of the pending charges as evidenced by the pretrial hearing of August 31, 1987."

The magistrate judge found there was ample evidence in the record to justify these findings, and therefore applied the presumption of correctness provided for under 28 U.S.C. § 2254(d). Of course, we are bound to apply the presumption of correctness to such state findings unless it is established that one of the exceptions to section 2254(d) applies. *Sumner v. Mata*, 101 S.Ct. 764 (1981).

Stoker argues that we should not apply the presumption of correctness to the state habeas court's findings because they are not fairly supported by the record.[3] *See* section 2254(d)(8). Stoker points to the testimony of Thomas Page Brittain (Brittain), the attorney who represented Todd on the drug charge in Potter County. Brittain testified that he told Potter County prosecutors that his client had information about the Hale County crime, and that he did so in the hope that his client would receive "some kind of consideration in his treatment . . . in the case in Potter

---

[3] Stoker also contends that the state habeas court's findings are not entitled to the presumption of correctness because the state habeas court applied an erroneous legal standard, thereby rendering the fact finding procedure inadequate "to afford a full and fair hearing." 28 U.S.C. 2254(d)(2). Stoker's claim in this regard is patently unmeritorious, and is rejected.

13

County."[4]  Stoker also emphasizes the notation in Todd's file in the Potter County district attorney's office stating "Dismissed: this [defendant] helped Terry McEachern (296-5229) D.A. solve a murder case."  The affidavit of Virginia Lindsay (Lindsay), an attorney assisting in the investigation of Stoker's habeas claims, indicates that former Potter County assistant district attorney Ebelardo Lopez (Lopez) reviewed Todd's file in her presence, and that he held up a message slip indicating that he had received a call from Terry McEachern on April 20 regarding Carey Todd.[5]  There was apparently an additional notation in Lopez's handwriting stating, "[c]alled Terry."  Lopez, who was by then a state district judge, also submitted an affidavit indicating only that the telephone slip had contained the names Terry McEachern and Carey Todd.  However, the telephone slip itself subsequently disappeared, and therefore was not produced.  Based on this evidence, Stoker asserts that the Hale County district attorney communicated with the Potter County district attorney's office regarding Todd's case.[6]  The state habeas court found that Lopez knew that Todd was

---

[4]     However, when asked whether the information influenced the Potter County district attorney's decision to dismiss the charge, Brittain replied: "I don't know exactly what influenced them, no, sir.  I——I assumed that that was what influenced them, yes."

[5]     Terry McEachern was the district attorney for Hale and Swisher Counties, and was the prosecutor in Stoker's trial.

[6]     In his reply brief, Stoker mentions the testimony of his cousin, Gale Keiser.  At the federal evidentiary hearing below, Keiser testified that she heard Ronnie Thompson state that "[t]he reason why [Todd] was helping to set [Stoker] up is because they were going to drop some charges in Amarillo against him."  Keiser's

14

a witness in the Stoker murder case.  Nevertheless, the state habeas court rejected Stoker's argument that the drug charge against Todd was dismissed in exchange for his testimony against Stoker.

We note that there is additional evidence in the record of the state habeas hearing that bears on the dismissal of the Potter County drug charge.  Lopez testified that the reason that the Potter County drug charge was dropped was because the State was unable to connect the controlled substance to Todd beyond a reasonable doubt; that he had not dismissed the case at the request of McEachern; and that McEachern never asked him to do so.  Randall Sims (Sims), an assistant district attorney for Potter County, testified that he had no knowledge of McEachern's "intervening in that case," and that if there were insufficient evidence to connect a defendant to the drugs, such a charge would be dismissed by his office.  McEachern additionally testified at the state evidentiary hearing that he did *not* discuss with the Potter County district attorney "the possibility of him dismissing any charge against Carey Todd in Potter County in return for his testimony in Hale County," and that he made no promise to Todd that the charges against him would be dismissed in exchange for his testimony against Stoker and knew of no one who did.  Todd himself testified

affidavit submitted at the state evidentiary hearing similarly indicated Ronnie Thompson told her "that Carey Todd told him that he was setting David up so that Carey could stay out of jail on a charge in Randall County."

15

that all he knew about the drug charge was that his "attorney took care of it," and answered "no" when asked by McEachern if he was promised assistance in getting the charge dropped. Todd further testified he had no knowledge that McEachern knew about the Amarillo case, and that McEachern never told him or anyone he knew that he (McEachern) "could assist in getting any charges dropped or anything like that about any Amarillo cases." Finally, Brittain, who represented Todd on the Potter County charge, indicated that he knew of no involvement by McEachern, or by his staff, or by any Hale or Swisher County law enforcement officer, in the dismissal, that he had not talked about the dismissal with McEachern, and that he had no reason to question the reason for the dismissal given by Lopez in the motion submitted to the Potter County court.

While there is conflicting evidence in the record, "[t]he determination whether the record fairly supports a state court finding requires a high measure of deference." *James v. Whitley*, 39 F.3d 607, 610 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 1704 (1995). "Mere disagreement with a state court finding does not entitle a federal court to overturn it." *Id*. The state habeas court specifically credited Lopez's testimony as to the reason for the dismissal. *See Self v. Collins*, 973 F.2d 1198, 1214 (5th Cir. 1992)("'§ 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'")(quoting *Marshall v. Lonberger*, 103 S.Ct. 843, 851 (1983), *cert. denied*, 113

16

S.Ct. 1613 (1993). There was substantial testimony of record by McEachern, Lopez, and Todd as to the absence of any such agreement, and Brittain also testified that he was aware of no agreement to this end. The foregoing evidence leads us to conclude that the state habeas court's finding that there was no agreement that the Potter County drug charge would be dismissed in exchange for Todd's testimony is fairly and adequately supported by the record, and is therefore entitled to section 2254's presumption of correctness. In the absence of any such agreement, Todd's *Brady* claim fails.[7]

B.    Crimestoppers Reward

Stoker also argues that the district court erred in rejecting his contention that the prosecution failed to disclose the fact that Todd and Deborah Thompson received a $1,000 reward for their testimony against Stoker. In this regard, the state habeas court made the following findings:

> "38. Applicant's sixteenth claim that the State failed to disclose that witnesses Deborah Thompson and Carey Todd received cash payments as rewards for their testimony against him, was addressed in the postconviction evidentiary hearing. Based on the record of that hearing, the court finds no credible evidence that either Todd or Thompson received

---

[7]    We do find, however, that the state habeas court's finding that prior to or at trial Stoker and his counsel were aware of the pending drug charge against Todd is not supported by the record. Nonetheless, this does not undermine our conclusion that no *Brady* violation has been proven. The failure to disclose the pending drug charge would be material on the facts of the present case only if it were proven that there was some character of promise of favorable treatment in exchange for Todd's testimony.

17

the Crimestoppers reward in exchange for their testimony against David Stoker.

39. Shortly after the murder, the convenience store which employed victim, David Mannrique, posted a $1000 reward for information leading to the arrest and conviction of the perpetrator. The offer was placed with Hale Center Crimestoppers. Claude Burnett, Crimestoppers Director, testified that after the conclusion of applicant's trial, on October 27, 1987, he received a telephone call to deposit the Crimestoppers money into the Hale County Bank. He had no knowledge to whom the money was paid. Talmadge Todd, Carey Todd's father, testified that he wired $1000 to his son in Honey Grove, Texas, where Carey moved after the trial because he feared for his life. Carey Todd testified that after the trial, on November 11, 1987, he received $1000 in Crimestopper's money, and $300 from the Swisher County Police Department to help him move to Honey Grove. He and Debbie Thompson split the $1000. Todd never spoke with the Hale Center Police Department concerning the case. He further testified that District Attorney Terry McEachern never offered him anything, and that he had no knowledge that he would be paid a Crimestopper's reward until the trial was over. Riley Rogers testified that Terry McEachern and the (Hale and Swisher County) district attorney's office has 'nothing to do' with Crimestoppers or the Crime Line. Riley Rogers is the county attorney's investigator for Swisher County, Texas.

40. This court specifically finds that neither the district attorney's office for Hale and Swisher counties nor Terry McEachern, district attorney for those counties, were in any way involved with Crime Line, Crimestoppers, or otherwise had anything to do with awarding the reward received by Deborah Thompson and Carey Todd after the conclusion of Stoker's trial for information they provided leading to the arrest and conviction of applicant David Stoker. No request was made for the reward until after the trial. The reward was for evidence leading to conviction. No promise

18

> was made to Carey Todd or Deborah Thompson that they would receive a reward for their testimony." (Internal record citations omitted).

Stoker maintains that these findings are not fairly supported by the record, and therefore are not entitled to a presumption of correctness. Stoker first argues that there is evidence that Todd and Deborah Thompson told several other witnesses that they had been promised money in exchange for their cooperation in the case. Todd cites the trial testimony of Wayne Reed in which he indicated that Deborah Thompson had told him that Todd had been offered money in exchange for the Ruger pistol. Of course, this provides no evidentiary support for the existence of any promise to pay Todd or Deborah Thompson for their testimony at trial. Stoker also cites the affidavit of Virginia Lindsay submitted at the state habeas hearing about her November 6, 1991, interview with Todd regarding the Crimestoppers reward. Lindsay states in this affidavit that Todd "said Terry McEachern had offered him and Debbie Thompson $1,000 for their testimony. He also said that when they got the money, they split it fifty-fifty, and that they were told about the money before they testified.[8]

---

[8] Stoker also cites the testimony of his cousin, Gale Keiser, at the federal evidentiary hearing. In response to a question regarding whether Ronnie Thompson had told her that Todd was being paid for his testimony, Keiser replied: "He said that it was a setup, that they were setting David up and that Kerry (sic) was being paid." Keiser offered a similar statement in her affidavit at the state evidentiary hearing stating "Ronnie said [Todd and Deborah Thompson] were getting money, and both expected to get a reward for what they were doing."

19

Stoker additionally emphasizes the reluctance of the prosecution witnesses to discuss the circumstances surrounding the payment of the reward money and their sometimes contradictory statements.[9] Indeed, the magistrate judge below observed that "[i]t certainly appears there were prosecution witnesses at the State Evidentiary Hearing who were, to put it generously, reluctant to discuss the circumstances surrounding the payment of the Crime Stoppers reward." Nonetheless, the magistrate judge properly concluded that "whatever suspicion might be engendered by the stubborn recalcitrance of certain witnesses to testify accurately and fully about the procedures and post trial events involving the Crime Stoppers payment is not evidence that payment was made in the

---

[9]     Richard Cordell (Cordell), the chief of police for Hale Center in 1986 and 1987, testified that at the time of the Mannrique murder Hale Center did not have its own Crimestoppers program, that Crimestoppers was run through the Plainview, Hale County Crime Line, and that it was not administered by the Hale Center Police Department.

Riley Rogers (Rogers), who had worked as an investigator for the Hale and Swisher County District Attorney, testified initially at the state habeas hearing that he had no involvement with Crimestoppers and that he knew of no rewards paid in connection with the Mannrique case. However, Stoker's counsel subpoenaed a bank draft issued by the First National Bank of Hale Center, payable to Crime Line, and bearing Rogers' signature. At the continuation of the state evidentiary hearing on January 27, 1992, Rogers agreed with the prosecutor that it was possible that he had received the $1000 and transferred it to Talmadge Todd after the trial. However, he also then testified that he had no knowledge of any monies being promised to Carey Todd in exchange for testimony.

Claude Burnett (Burnett), a local businessman, testified at the state evidentiary hearing that he had helped organize the Hale Center Crime Line, that a reward had been offered in connection with the Mannrique case, and that he believed that he had discussed payment of the reward with Cordell as chief of police, although he expressed some uncertainty on this point.

20

fashion as alleged by Stoker."

Todd acknowledged at the state evidentiary hearing that he had received $1000 from Crimestoppers and that he had split the reward money with Deborah Thompson. In response to questioning, Todd indicated that neither McEachern nor any law enforcement personnel had promised to give him money in exchange for his testimony. Although Todd initially stated he did not know when he became aware of the Crimestoppers reward money, he later testified in response to an inquiry from the court that he did not know he would be paid a reward until after the trial. McEachern also testified that as a general matter "[w]e don't pay county taxpayer's (sic) monies, you know, to people to get up on the stand to testify," and that he did not even learn of the payment of the Crimestoppers reward until shortly before the state evidentiary hearing.

We find fair and adequate support in the record for the state habeas court's findings, and therefore must accord them the presumption of correctness that they are due. Clearly the state habeas court's finding that there was no promised payment of a reward in exchange for testimony rests upon its assessment of the credibility of the witnesses before it, and we are not empowered to second-guess such determinations. *See Self*, 973 F.2d at 1214 ("'When . . . a trial court fails to render express findings on credibility but makes a ruling that depends upon an implicit determination that credits one witness's testimony as being truthful, or implicitly discredits another's, such determinations

21

are entitled to the same presumption of correctness that they would have been accorded had they been made explicitly")(quoting *Lavernia v. Lynaugh*, 845 F.2d 493, 500 (5th Cir. 1988)). Therefore, Stoker's second *Brady* claim must also fail.

II.  Ineffective Assistance of Counsel

In reviewing a habeas petitioner's claim for ineffective assistance of counsel, the state habeas court's findings of historic fact are entitled to a presumption of correctness under 28 U.S.C. § 2254(d), but the deficient performance and prejudice components of the *Strickland* standard are mixed questions of law and fact which must be reviewed *de novo*. *Amos v. Scott*, 61 F.3d 333, 348 (5th Cir.), *cert. denied*, 116 S.Ct. 557 (1995).

In order to obtain habeas relief based upon a claim of ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's performance was deficient and (2) that counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 104 S.Ct. 2052, 2064 (1984). To demonstrate that counsel's performance was deficient, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Id*. at 2064-65. There exists a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 2065. The prejudice component of the *Strickland* standard will be satisfied only if "there is a reasonable probability that, but for counsel's

22

unprofessional error, the result of the proceeding would have been different." *Id*. at 2068. "A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id*. As the *Strickland* standard is conjunctive, a court may dispose of an ineffective assistance of counsel claim based upon the petitioner's failure to satisfy either prong of the test. *Amos*, 61 F.3d at 348.

> A.  Failure to Introduce Evidence That Car in Which Fourth Shell Casing Found Purchased Several Months After the Murder

Stoker argues that his trial counsel provided constitutionally ineffective assistance because he failed to introduce evidence that the car from which the fourth empty shell casing was retrieved on May 18, 1987, had been purchased in April 1987, some six months after the murder. Ron Felty (Felty), Stoker's trial counsel, acknowledged at the state evidentiary hearing that he was aware that Stoker had not then owned the car "all that long," and that Felty had failed to introduce this evidence at trial (there was no trial evidence whatever as to even approximately how long prior to May 18, 1987, Stoker had had the car). Stoker urges that this piece of evidence was crucial to his defense based on the fact that the jury's note to the trial court specifically inquired as to the exact date that the shell casing was found in Stoker's car.

The magistrate judge rejected this claim, reasoning:

> "There was no evidence of a credible nature indicating the shell casings found in the automobile were fired from the murder weapon at the moment of the murder. It was

23

> simply evidence there were shell casings in the Stoker vehicle indicating that Stoker or someone associated with him had fired the weapon, and the shell casings had dropped in the car. It was not crucial evidence. It was simply another circumstance of Stoker's possession of the weapon. Even if the car had only been purchased a day before Stoker was arrested, it still would be admissible and relevant evidence having the same impact. This is really a frivolous claim."

We are inclined to agree. Even assuming *arguendo* that the failure to introduce this evidence constituted deficient performance, Stoker simply cannot establish any "reasonable probability" that but for Felty's failure to introduce evidence that the car had only recently been purchased the outcome would have been different. As the magistrate judge properly observed, this was simply another piece of evidence connecting Stoker to the murder weapon. And, it was essentially undisputed that Stoker had been in possession of the gun at least on several occasions after the murder and several months before April 1987, including November and December 1986. We conclude that Stoker fails to establish prejudice under *Strickland*.

B.   Failure to Present Additional Mitigating Evidence

Stoker additionally contends that he received constitutionally ineffective assistance at trial because Felty failed to adequately investigate and present evidence in mitigation at the punishment phase of the trial. In particular, Stoker cites the testimony of his cousin, Gale Keiser, regarding Stoker's caring relationship with his younger siblings and his mother, his aid to his grandmother after she suffered a stroke, and his advice and comfort

24

to Keiser when she encountered marital difficulties. Stoker also points to the affidavits of former employers and co-workers to the effect that Stoker was a good worker and did not use drugs or alcohol on the job. This evidence is cumulative of the testimony presented by his mother during the punishment phase of the trial. In light of the "strong presumption that counsel's conduct falls within the wide range of  reasonable professional assistance," *Strickland*, 104 S.Ct. at 2065, we cannot say that Felty's failure to offer this evidence satisfies the deficient performance prong of *Strickland*. Nor is the requisite prejudice shown. There is no reasonable probability of a different result had these witnesses been called.[10]

---

[10]  With respect to Stoker's claim that he received ineffective assistance due to Felty's failure to conduct a reasonable sentencing investigation, the state habeas court specifically found as follows:

> "29. This court finds that counsel Ron Felty conducted a reasonable investigation. He interviewed those members of applicant's family who were willing to cooperate with applicant's defense, and followed any witness leads provided by applicant and his family. Additional information, which applicant now contends should have been used to undermine testimony of the state's witnesses remained undisclosed for tactical reasons."

The evidence adequately supports the underlying facts so found, and we agree that on such findings the investigation was not constitutionally deficient. Furthermore, as noted above, the evidence to be thus produced was merely cumulative of the testimony offered by Stoker's mother, and Stoker was not prejudiced by the failure to investigate further. There is no reasonable probability of a different result had such further investigation been undertaken.

Stoker also urges that Felty should have introduced copies of his Army records, some of which contained positive evaluations. However, these records also reflected that Stoker was given an early discharge, albeit an honorable one, due to an alcohol problem. Felty, a local practitioner and former district attorney who had extensive experience before Hale County juries, testified: "if we showed a continuing use of narcotics, alcohol use as the reason for being taken out of the military, that would not, you know, go over with a Hale County jury. A Hale County jury is tougher than an old billy." As we have previously observed, "failure to present mitigating evidence 'if based on an informed and reasoned practical judgment, is well within the range of practical choices not to be second-guessed.'" *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992)(quoting *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985)), *cert. denied*, 113 S.Ct. 3035 (1993). Again, Stoker fails to overcome the strong presumption that this tactical decision was reasonable under the circumstances, and therefore fails to satisfy the deficient performance prong of *Strickland*.

Furthermore, Stoker has failed to show that either the testimony cited above or the mentioned records constitute "evidence of sufficient quality and force" which "if introduced, would have more likely than not persuaded the jury that the death penalty was unwarranted." *Mann v. Scott*, 41 F.3d 968, 984 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 1977 (1995). Therefore, Stoker also fails

26

to satisfy the prejudice prong of *Strickland*.

Stoker further asserts that Felty erroneously understood Texas law to preclude the presentation of any mitigating evidence during the punishment phase of a capital trial. Stoker relies for this argument upon Felty's statement at the state evidentiary hearing that the "death penalty statute did not provide, basically, for instruction regarding mitigating evidence for a jury to consider. And the way I interpret the cases, that type of evidence was not admissible." However, this isolated fragment has been removed from its proper context. When viewed in its full surroundings, this statement reflects a more limited meaning:

> "Q:  I had asked you about the evidence of abuse in the sentencing phase, and you said you thought it was not admissible under the statute at that time.
> A:  Correct.
> Q:  What did you mean by that?
> A:  That the death penalty statute did not provide, basically, for instruction regarding mitigating evidence for a jury to consider. And the way I interpret the cases, that type of evidence was not admissible."

The phrase "that type of evidence" refers only to evidence of past acts of abuse committed against Stoker, not to all mitigating evidence. Indeed, the fact that Felty offered the testimony of Stoker's mother in mitigation clearly refutes Stoker's present claim that Felty understood Texas law to preclude the presentation of any mitigating evidence during the punishment phase.[11]

---

[11]  Although Felty was in error as to the admissibility of evidence of abuse under the Texas capital sentencing scheme at the

27

C. Failure to Procure Mental Health Expert to
Rebut Dr. Grigson's Testimony

Lastly, Stoker submits that his trial counsel rendered constitutionally ineffective assistance for failing to procure a defense mental health expert to rebut the testimony of Dr. Grigson regarding future dangerousness at the sentencing phase of the trial.[12]

Stoker argues that Felty's failure to rebut Grigson's testimony cannot be considered reasonable trial strategy as it was

---

time, *see, e.g., May v. Collins*, 904 F.2d 228, 232 (5th Cir. 1990)(indicating that "[h]ad [defendant] offered evidence of his abusive childhood and his resultant neurological damage, it is quite clear under Texas law that evidence would have been admissible"), *cert. denied*, 111 S.Ct. 770 (1991), he was correct regarding the availability of an instruction as this case was tried in 1987 before *Penry v. Lynaugh*, 109 S.Ct. 2934 (1989). However, Stoker does not argue in his brief before this Court that he received ineffective assistance of counsel due to Felty's failure to present evidence of past abuse, and this issue is therefore waived. Nor does the record show available evidence of abuse such that had it been introduced there is any reasonable probability of a different result. Furthermore, Felty testified several times during the course of these proceedings that neither Stoker nor his family ever told him of any abuse. Moreover, Felty stated in his affidavit of August 28, 1991, that he would not have presented such evidence to the jury as he believed it would have been an aggravating factor and would have bolstered the State's case on the future dangerousness issue. Counsel is not constitutionally deficient for failing to foresee *Penry*. *See May* at 234. Even if this claim had been properly presented on appeal, we would have rejected it as failing both prongs of the *Strickland* test. *See, e.g., Andrews v. Collins*, 21 F.3d 612, 623-25 (5th Cir. 1994).

[12] There is no dispute between the parties that Felty was made aware during the pretrial hearing of the State's intention to call Grigson as an expert witness at the punishment phase of the trial, and that Felty elected not to request the appointment of a defense expert at that time.

28

based upon an erroneous understanding of the law. In support of this argument, Stoker maintains that Felty misunderstood the Texas capital sentencing scheme and declined to engage an expert based on the erroneous belief that information contained in the expert's report might open the door to the admission of otherwise inadmissible evidence of extraneous unadjudicated offenses at the punishment phase by the prosecution. In fact, Texas permits the introduction of any relevant evidence during the punishment phase, including extraneous unadjudicated offenses. *See Powell v.* State, 898 S.W.2d 821, 830 (Tex. Crim. App. 1994), *cert. denied*, 116 S.Ct. 524 (1995). However, Stoker's factual assertion in this respect is contradicted by Felty's testimony at the evidentiary hearing below.[13] The district court concluded, and we agree, that Felty

---

[13] At the evidentiary hearing, Felty testified:

"Q: One of the reasons that you decided not to call a mental health expert was because of your fear that evidence of these other crimes would come in, is that right?
A: Yes, sir.
Q: Were you aware of the fact that under the Sentencing Statute——Pardon me, under the Death Penalty Statute, that in the sentencing phase of a capital case, just about anything can come in?
A: Anything. It's just an open, it's an open ball game.
Q: All right. Almost wide open?
A: Yes.
Q: Were you aware of the fact that had the prosecution decided, decided to put in this evidence about these prior cases, they could have done it anyway?
A: Yes, sir. The same thing about the deal up in Randall County.
Q: Right.

29

made a strategic decision not to have his client examined by a court-appointed psychologist or psychiatrist because the examining expert might uncover evidence with regard to other crimes for which Stoker was being investigated. While Felty was aware that extraneous offenses were admissible during the punishment phase, he made the strategic decision not to have his client examined because he feared that his own expert might provide the State with *additional* information linking his client to those crimes when subjected to cross-examination.[14]

---

A:   The quote "suspected homicide" up there.
Q:   So this trial strategy not to call a mental health expert, not calling him wouldn't have made any difference, because if the State wanted to put it in, it would have gone in anyway?
A:   Yes, sir.
Q:   You didn't get Mr. Stoker examined because, in response to the question put by counsel, you believe that the prosecution would have access to that information, is that right?
A:   They would have subpoenaed him."

[14]   At the federal evidentiary hearing, Sam Ogan (Ogan), a criminal defense attorney offered by Stoker, testified based upon a hypothetical tailored to the facts of this case regarding the need for expert psychiatric testimony. The hypothetical asked Ogan to assume that he was aware his client was suspected of "possible homicides and drug activities." Ogan replied: "Well, I would say that based on the hypothetical, it might be reasonable not to put a psychologist or a psychiatrist who has examined the client on the stand, I mean, assuming damaging information in the doctor's report. If, generally under the law, if the psychologist or psychiatrist testifies, then the State would be privy to the report that he made." Although Ogan went on to say that he did not believe it was reasonable not to have the client examined at all, Stoker complains here of the failure to put on expert testimony to rebut Grigson, not of the failure to have him examined in the first place. So Stoker's own witness in fact validated the reasonableness of Felty's strategy. *See also Schneider v. Lynaugh*, 835 F.2d 570, 576-77 (5th Cir.)(State's use of testimony by

30

In any event, the expert psychological testimony which Stoker offered during the course of the habeas proceedings simply fails to demonstrate prejudice. Dr. Linda Foss (Foss), a clinical psychologist, found based on her examination that Stoker possessed

psychiatrist appointed to examine defendant for competency at defendant's request to rebut other psychiatric evidence offered by defendant during punishment phase did not violate Fifth Amendment despite absence of *Miranda* warning because defendant put mental state in issue), *cert. denied*, 109 S.Ct. 87 (1988); *see also Soria v. State*, 1996 WL 514830, at *4-10 (Tex. Crim. App. Sept. 11, 1996)(defendant constructively places himself on stand when he presents psychiatric testimony waiving Fifth Amendment privilege, thereby allowing court to compel examination by State's expert for rebuttal).

To be sure, as noted above, after the state closed its punishment stage evidence on October 27, 1987, defense counsel unsuccessfully moved for a continuance to secure court funds "for the defense to have a witness, psychiatric testimony," and indicated they had unsuccessfully looked for a psychiatrist "the last week." The defense also wanted an expert on parole law. After the court stated to defense counsel that at the August 31, 1987, pre-trial hearing "you did not want to have your client examined. You did not want that sort of testimony," defense counsel stated:

> "the nature and circumstances as well as the evidence available to the Defense has changed almost daily throughout this trial. And at certain times, you know, based on the evidence we have, the Defense would have to take a certain course in defending Mr. Stoker. As we are provided new evidence of certain information being known to Mr. McEachern or new witnesses provided, you know, it changes the basis of our Defense, too, Judge."

Defense counsel pointed to nothing specifically new, however. In substance, it appears that the defense rethought or changed its approach. But this does not mean that the earlier approach was outside the "wide range of professionally competent assistance" recognized in *Strickland*, 104 S.Ct. at 2066, and so many other cases. As we said in *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992), *cert denied*, 114 S.Ct. 97 (1993), "[h]aving a 'wide range' necessarily allows for situations in which each of two opposite courses of action may properly fall within the ambit of acceptable professional conduct."

31

"average intelligence," and her report indicated that "[i]nadequate socialization left him with rough manners and habits and rebellious attitude, but at the same time there's evidence that he held himself to a moral code that included . . . honesty, responsibility, and fair play." Foss also testified that she found no evidence of psychotic personality, homicidal or suicidal tendencies. She finally indicated that a description of a single incident without an examination and some knowledge of the individual's personal history would be inadequate to form an opinion as to future dangerousness. Dr. Harry Munsinger (Munsinger), also a clinical psychologist, testified at the federal evidentiary hearing that Stoker was a passive/aggressive personality. He further opined, "I think, based on my analysis of his personality structure, that given certain conditions such as he is not under the influence of alcohol and he doesn't have a gun and he's not provoked, that the probability is that he will not be dangerous in the future." Munsinger also was of the opinion that it was not possible to predict future dangerousness solely on the basis of the hypothetical presented to Grigson as it contained a "hidden predicate" which was that the person possessed a psychopathic personality disorder. Munsinger also testified that a psychopathic personality is an "all-or-nothing phenomenon," and cannot be quantified on a scale of one to ten as Grigson testified.

In short, the experts offered by Stoker simply fail to rebut the main thrust of Grigson's testimony as to future dangerousness.

32

Although Foss testified that a hypothetical of the sort given to Grigson was an inadequate basis from which to form an opinion regarding future dangerousness, she offered no such opinion herself. Munsinger's assessment was similarly less than encouraging as he indicated that Stoker would not be dangerous in the future provided that "he is not under the influence of alcohol *and* he doesn't have a gun *and* he's not provoked." (Emphasis added). While both experts testified that Grigson based his opinion on inadequate information, the fact that Grigson had testified solely on the basis of the hypothetical facts given him, and had neither interviewed Stoker nor reviewed his personal history, was placed before the jury. Given the nature of the expert testimony proffered by Stoker, we are unable to say that this evidence "if introduced, would have more likely than not persuaded the jury that the death penalty was unwarranted." *Mann,* 41 F.3d at 984. Nothing in this respect (or otherwise) undermines confidence in the verdict.

## Conclusion

For the foregoing reasons, the judgment of the district court is hereby

AFFIRMED.